# THE ELIZABETH JONES.

# THE WILLIS.

APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR
THE NORTHERN DISTRICT OF ILLINOIS.

Argued November 13, 1884.—Decided December 15, 1884.

A schooner was sailing E. by N., with the wind S., and a bark was close-hauled, on the port tack. The schooner sighted the green light of the bark about half a point on the starboard bow, about three miles off, and starboarded a point. At two miles off she starboarded another point. As a result the light of the bark opened about two points. The bark let her sails shake and then filled them twice. The schooner continued to see the green light of the bark till the vessels were within a length of each other, when the bark opened her red light. At the moment the vessels were approaching collision, the schooner put her helm hard a-starboard, and headed northeast. At that juncture the bark ported, and her stem struck the starboard side of the schooner amidships, at about a right angle: *Held*, That the bark was in fault and the schooner free from fault.

If the case was one of crossing courses, under article 12 of the Rules prescribed by the act of April 29, 1864, ch. 69, 13 Stat. 58; the schooner being free and the bark close-hauled on the port tack, the bark did not keep her course, as required by article 18, and no cause for a departure existed under article 19, and she neglected precautions required by the special circumstances of the case, within article 20.

The final porting by the bark was not excusable, as being done *in extremis*, because it was not produced by any fault in the schooner.

The decree of the Circuit Court was affirmed without interest.

On the 12th of August, 1873, James R. Slauson and William R. Pugh filed a libel in admiralty, in the District Court of the United States for the Northern District of Illinois, against the bark Elizabeth Jones, to recover damages for the total loss of the schooner Willis, owned by them, and of the freight money on her cargo, through a collision which occurred between the two vessels shortly before two o'clock A. M. on the 11th of November, 1872, on Lake Erie. The Willis was on a voyage from Chicago to Buffalo with a cargo of barley, and the Jones was bound from Buffalo to Chicago with a cargo of coal.

## Statement of Facts.

The libel alleged that the course of the Willis was east by. north, the wind being from the southward, and about south, and about a six-knot breeze; that about two o'clock A. M. the lookout reported a green light half a point on the starboard bow of the Willis, and apparently two or three miles distant; that the Willis had the wind free, and the vessel showing the green light, and which afterwards proved to be the Jones, was, to those on board of the Willis, evidently by the wind and close-hauled; that the helm of the Willis was put to starboard, and she went off a point and was steadied; that the Jones came on, still showing her green light, when, in order to give her a wide berth, the helm of the Willis was again put to starboard, and she went off another point and was steadied; that the Jones continued to approach, but, apparently, not holding her course, keeping away, though still showing her green light only; that the helm of the Willis was put to starboard, and she swung off so as to head northeast; that, about the same time, the Jones showed both her red and green lights; that the Jones immediately came into collision with the Willis, head on, striking her amidships, at right angles, crushing in her side, and causing her to sink in a very short time; that, had the Jones kept her course, she would have passed the Willis on her starboard hand, safely; and that the Jones not only kept away while she was approaching the Willis, but when she had neared the Willis, so that there was imminent danger of colliding, she improperly ported, instead of starboarding, her helm.

On the 1st of October, 1873, the owners of the Jones filed their answer to the libel. It averred that the Willis had the wind free, about a six-knot breeze, from about south; that the Jones was sailing by the wind, close-hauled; that the Willis discovered the Jones two or three miles distant; that immediately preceding the collision the Willis put her helm to starboard, and the Jones put her helm to port, but in approaching the Willis the Jones did not change her course until a collision became imminent, and the Willis made no change of course to avoid the Jones, except, as before stated, immediately preceding the collision; that the lookout of the Jones discovered what proved to be the light of the Willis from two to four

miles distant; that she "was approaching the Jones in an op-posite direction from the course of the Jones; that, when the light of the Willis was first seen, it was almost dead ahead, and continued on that line as the vessels approached each other;" that the Jones was kept steadily on her course until, seeing that there was danger of a collision, her helm was ported, but those in command of the Willis caused her helm to be put to star-board, which threw her across the bows of the Jones and caused the collision, and that it resulted entirely from the fault of the Willis.

On the 4th of October, 1873, the owners of the Jones filed a cross-libel against the Willis, to recover for damage caused to the Jones by the collision. It contained substantially the same averments as the answer to the libel of the Willis, adding the fact that the Jones struck the Willis between her fore and main rigging.

The case was heard on pleadings and proofs by the District Court, in February, 1875, and, after the hearing and before a decision, leave being granted to the owners of the Jones to amend their answer and their cross-libel, they filed an amended answer on the 8th of March, 1875. It varied the allegations of the original answer, by stating that the Willis discovered the Jones about three miles distant, but did not see the green light of the Jones; that, immediately preceding the collision, the Jones began to put her helm to port, but, seeing that the Willis was starboarding her helm, immediately changed it to starboard; that the lookout of the Jones discovered, about half a point on his port bow, and three miles off, the red light of a vessel that proved to be the Willis; that, after the light of the Willis was first seen, it continued to show more on the port bow of the Jones; that the Jones was kept on her course until immediately before the collision, when she began to port her helm, but, seeing that the Willis was starboarding her helm, immediately changed it to starboard, but the Willis continued to starboard her helm, which threw her across the bows of the Jones; and that the starboard bow of the Jones came in contact with the starboard side of the Willis about amidships. On the same day the owners of the Jones filed an amended

cross-libel, containing substantially the same averments as the amended answer, in variation of those in the original cross-libel. The original libel was, by stipulation, made the answer to the cross-libel.

In July, 1875, the District Court entered a decree, finding that the Willis was in fault, dismissing her libel, pronouncing for the libellants in the cross-libel, and awarding to them $1,500 damages. The owners of the Willis appealed to the Circuit Court. In August, 1881, that court entered a decree, finding that the Jones was in fault, reversing the decree of the District Court, dismissing the cross-libel, pronouncing for the libellants in the original libel, and awarding to them $32,826.75 for damages and interest. From that decree the owners of the Jones appealed.

The Circuit Court filed the following findings of fact:

"First. That on the 11th day of November, 1872, a collision occurred between the schooner Willis and the bark Elizabeth Jones, on Lake Erie, at about 16 miles east of Point au Pelee. The libellant, the schooner Willis, was bound for Buffalo; the respondent, the bark Jones, was bound for Chicago. The vessels collided at a quarter before two in the morning. The Willis was sailing east by north. The bark was sailing a general course southwest by west one-half west, steering by the wind. The wind was south, about a six-knot breeze, at the time of the collision. Previous to the collision it had been southeast, picking up to the westward. At twelve o'clock the wind was east. At twenty minutes after one it was southeast. At the time of the collision it was south. The Willis had the wind free, and the bark was close-hauled on the port tack. Both vessels had their proper lights and watch on deck. The vessels were between two and four miles apart when they sighted each other's lights. The night, though it occasionally clouded up, was favorable, and light enough to make objects easily discernible for two or three miles. The schooner was laden with a cargo of barley, and the bark with a cargo of coal. When the vessels collided, the starboard side of the stem of the bark struck the schooner on the starboard side between the fore and main rigging—struck her amidships, at about

right angles, on the starboard side. The schooner and her cargo sank in less than half an hour and were a total loss. The injury sustained by the Jones was fixed in the decree of the District Court at $1,500.

Second. The officers and men of the schooner Willis first sighted the green light of the bark Jones, about half a point off the schooner's starboard bow, at a distance of about three miles off, and continued to see the green light of the Jones until the vessels were within a length of each other, when the Jones opened her red light.

Third. The helm of the Willis, as soon as the light of the Jones appeared, was at once put to starboard, and she went off a point and then steadied, the light of the Jones thereupon opening about a point and a half. When about two miles distant the helm of the Willis was again put to starboard a point, and then steadied, the light of the Jones thereupon opening about two points.

Fourth. That the mate in command of the Jones gave the following order immediately after first sighting the light of the Willis: 'I went aft to the man at the wheel to see how she was headed, and her sails were then kind of shaking. I told him to "look out and keep the sails full." Then I went forward again. By the time I got forward the sails was lifting. Again I told him to keep the sails full—"draw up and keep the sails full."'

Fifth. At the moment the vessels were approaching collision, the helm of the Willis was put hard a-starboard, and she must have swung so as to head northeast, and thus have exposed her starboard side. At this juncture the Jones ported her helm, and the vessels collided, the stem of the Jones striking the Willis amidships, on the starboard side."

The Circuit Court also filed the following conclusions of law:

"First. The court finds, as a conclusion of law, that this case falls under the 12th article of the regulations for preventing collisions at sea, applicable to the navigation of vessels.

Second. That the bark Jones, being close-hauled, and the schooner Willis being free, it became the duty of the Willis to

keep out of the way, and she, having come into collision, must show why she did not discharge that duty and avoid the collision.

Third. The court finds, as a matter of law, that each of the changes heretofore recited in the findings of fact, as having been made by the Jones, was improper.

Fourth. The court also finds, as a matter of law, that the changes recited in the findings of fact, as having been made by the Willis, were proper."

*Mr. Wirt Dexter*, for appellants.

*Mr. Robert Rae*, for appellees.

Mr. Justice Blatchford delivered the opinion of the court. He recited the facts as above stated, and continued:

There is a bill of exceptions, containing exceptions by the claimants of the Jones to the first, third and fourth conclusions of law. Our review of the decree below is limited by statute to a determination of the questions of law which arise on the record, under the facts stated by the Circuit Court. The opinion of that court, although, as required by a rule of this court, annexed to and transmitted with the record, is no part of it.

When this collision occurred, the regulations in force for preventing collisions on the water were those prescribed by the act of April 29, 1864, 13 Stat. 58. Articles 11, 12, 18, 19, and 20 of the "Steering and Sailing Rules" in that act have a bearing on this case, and are as follows:

### " Two sailing ships meeting.

Article 11. If two sailing ships are meeting end on, or nearly end on, so as to involve risk of collision, the helms of both shall be put to port, so that each may pass on the port side of the other.

### Two sailing ships crossing.

Article 12. When two sailing ships are crossing so as to involve risk of collision, then, if they have the wind on different sides, the ship with the wind on the port side shall keep out of

the way of the ship with the wind on the starboard side, except in the case in which the ship with the wind on the port side is close-hauled, and the other ship free, in which case the latter ship shall keep out of the way. But if they have the wind on the same side, or if one of them has the wind aft, the ship which is to windward shall keep out of the way of the ship which is to leeward."

"CONSTRUCTION OF ARTICLES 12, 14, 15 AND 17.

ARTICLE 18. Where, by the above rules, one of two ships is to keep out of the way, the other shall keep her course subject to the qualifications contained in the following article:

PROVISO TO SAVE SPECIAL CASES.

ARTICLE 19. In obeying and construing these rules due regard must be had to all dangers of navigation, and due regard must also be had to any special circumstances which may exist in any particular case rendering a departure from the above rules necessary in order to avoid immediate danger.

NO SHIP UNDER ANY CIRCUMSTANCES TO NEGLECT PROPER PRE-
CAUTIONS.

ARTICLE 20. Nothing in these rules shall exonerate any ship, or the owner, or master, or crew thereof, from the consequences of any neglect to carry lights, or signals, or of any neglect to keep a proper lookout, or of the neglect of any precaution which may be required by the ordinary practice of seamen, or by the special circumstances of the case."

A reference to the statements of the original answer of the Jones, and of her original cross-libel, shows, that the case she first attempted to make was one under Article 11, of two sailing vessels meeting end on or nearly end on, so as to involve risk of collision, where both are required to port. This is shown by the averments that the Willis " was approaching the Jones in an opposite direction from the course of the Jones; that, when the light of the Willis was first seen, it was almost dead ahead, and continued on that line as the vessels ap-

proached each other;" and that the Jones, seeing danger of a collision, ported, but the Willis starboarded. After the trial before the District Court, the amended answer and the amended cross-libel set up a case where the Jones saw, on her port bow, the red light of the Willis; that light continued to show more on the port bow of the Jones; the Willis did not see the green light of the Jones; and immediately before the collision, the Jones began to port her helm, but, seeing that the Willis was starboarding, changed her helm to starboard. This new theory on the part of the Jones as to her defence indicates plainly that she was conscious that her porting was a wrong manoeuvre, and that she undertook to account for the collision by alleging that she saw the red light of the Willis on her port bow, and that it opened more on that bow, and that the Willis, by starboarding after that, came across her path. This theory is negatived by the findings of the Circuit Court.

The salient facts exhibited in those findings are as follows: The Willis was sailing east by north. The Jones was sailing a general course southwest by west half west, steering by the wind. The collision occurred at a quarter before two A. M. At twelve midnight the wind was east. At twenty minutes past one, twenty-five minutes before the collision, the wind was southeast. At that time, if the Jones was sailing southwest by west half west, her course was nine points and a half from the wind, and she was not close-hauled. She could certainly, though a bark, hold the wind at seven points off. At the same time, the Willis, if sailing east by north, was five points from the wind. The wind being a six-knot breeze, it is plain, in view of the combined speed of the vessels, that they had not yet seen each other twenty-five minutes before the collision. The wind was hauling to the southward, and changed the four points, to south, in those twenty-five minutes. If, because of that change of the wind, the Jones, to hold the wind, fell off to seven points from the wind, she would be heading west by south, or directly opposite to the east by north course of the Willis.

The Willis made the green light of the Jones about half a point on her starboard bow, about three miles off, and contin-

ued to see that green light till the Jones was within a length off, when the Jones opened her red light. As soon as the Willis saw the green light of the Jones, she put her own green light against it by starboarding, and went off a point, and then steadied; that is, she headed east-northeast. It follows, that she showed her green light to the Jones. This starboarding by the Willis was when the vessels were about three miles apart, and from fifteen to eighteen minutes before the collision, as their combined speed was from ten to twelve miles an hour. The Jones must have seen that the Willis was falling off, and trying to get out of her way. Green light to green light was safety. When the Willis thus headed east-northeast, the green light of the Jones was one point and a half on her starboard bow. When the vessels were about two miles apart, that is, from ten to twelve minutes, the Willis fell off one point more, to northeast by east, and the green light of the Jones got to be two points on her starboard bow. All this time the Willis was trying to get out of the way of the Jones. She did so in a proper manner, by carrying her own green light away from the green light of the Jones, and by taking a course which did not and could not cross the course of the Jones. When the Willis thus, at two miles distance from the Jones, headed northeast by east, the Jones, with the wind south, would, if close-hauled at seven points from the wind, head no farther off than west by south. At the collision, the Willis was heading northeast, or one point more off; and the starboard side of the stem of the Jones struck the starboard side of the Willis amidships, at about right angles. To do this, the Jones must have headed about northwest, which was a change, by porting, of five points from her course of west by south, which latter course, with the wind south, would have allowed her, at seven points off, to be close-hauled, and have her sails full.

The Jones ran into danger by porting. She did not port to avoid collision or immediate danger. She ported when she must have seen, all the time, that the Willis was going away from her. This porting by the Jones was no part of keeping her course, and it caused the collision. It was a departure, by

the Jones, from the course which the Willis, constantly seeing the green light of the Jones, had a right to think the Jones would keep, especially in view of the persistent falling off of the Willis. It was, therefore, a change of course by the Jones. It was a change, by her, across the course of the Willis, to the extent of five points beyond her close-hauled course of west by south.

Conceding it to have been the duty of the Willis, under article 12, to keep out of the way of the Jones, it was equally the duty of the latter not to baffle or prevent the efforts of the Willis to that end. Her departure from the requirement of article 18, that she should keep her course, cannot be justified under article 19, because there were no special circumstances which rendered such departure necessary in order to avoid immediate danger. In *The Elizabeth Jenkins*, L. R. 1 P. C. App. 501, it is laid down, that if a ship bound to keep her course under article 18, justifies her departure from that course under the words of article 19, she takes upon herself the obligation of showing, both that her departure was, at the time it took place, necessary, in order to avoid immediate danger, and that the course adopted by her was reasonably calculated to avoid that danger. Under article 20, the special circumstances of the case required that the Jones should be careful not to port as and when she did. Article 20 was in force at the time of this collision, although it is not re-enacted in the Revised Statutes. Why it was omitted is not apparent, as it had not been repealed. It was one of the articles in the British act of 1862, 25 and 26 Vict., ch. 63, from which our act of 1864 was taken, and it still remains an article in the regulations promulgated by the British order in council of August 14, 1879, 4 P. D. 241, which states that it has been made to appear that the government of the United States is willing that those regulations shall apply to ships of the United States, whether within British jurisdiction or not, after September 1, 1880. We do not intend to intimate, however, that the precautions it enacts are not to be enforced as parts of the general law of navigation, though not now embodied in any statute.

The Circuit Court held that each of the changes recited in the findings of fact, as having been made by the Jones, was improper; and that the changes recited therein as having been made by the Willis were proper. In regard to the Jones, it is contended for her that she was at liberty to make such variations from her course as the wind rendered necessary, to enable her to keep her sails filled and keep on her port tack. It must be concluded, from the fourth finding of fact and the third conclusion of law, that the Jones was manœuvred on two occasions in such a manner as, first, to allow her sails to shake, and, second, to allow her to fall off and fill her sails; that this falling off was effected by putting her helm up or to port; and that the Circuit Court regarded these manœuvres as changes and as improper ones. In view of what it is found the Willis was doing, it is plain that these changes were calculated to baffle the efforts of the Willis, by starboarding, to get away from the Jones; and that they amounted to a following up of the Willis by the Jones. Although the wind had got as far as south, the Jones had no right to persist in falling off toward the Willis to an extent sufficient to produce a collision, when the Willis was all the while going away in the same direction. The duty of the Jones to keep her course did not permit her to do so in such a way as to bring about a collision with a vessel whose green light was constantly receding. There is no idea appertaining to keeping a course which justifies holding to it in such way as to bring on a peril. The only principle inherent in it is to so act as to enable the other vessel, on whom the duty rests, to adopt with success means of getting out of the way.

It is apparent that, notwithstanding the alleged endeavor of the Jones to keep close-hauled, with the wind south, the Willis, by her starboarding two points, from a course east by north to a course northeast by east, would have gone clear of the Jones, but for the porting of the Jones, as found in the fifth finding of fact, which carried her head around at least five points towards the Willis. The following diagram illustrates the courses and bearings of the two vessels, prior to any starboarding by the Willis and to any porting by the Jones:

It shows the Willis on a course east by north, and the Jones on a course southwest by west half west, five points and a half from south. At that time the vessels were three miles apart, or fifteen to eighteen minutes. When they were two miles apart, or ten to twelve minutes, after the Willis had twice starboarded, and to northeast by east, the green light of the Jones bore two points on the starboard bow of the Willis. Then, with any proper falling off of the Jones to hold a south wind, even to the extent of seven points, or to west by south, when the Willis was on a course northeast by east, or two points away from the course of the Jones, there would have been no collision, if the Jones had not ported five points more.

It is contended for the Jones that the Willis should have ported, instead of starboarding. But, as she saw the green light of the Jones on her starboard bow, to have ported would have thrown her across the course of the Jones, as shown by the following diagram:

By starboarding and going away from the green light of the Jones, the Willis took a course of safety, and, in the language of the cases "determined the risk." Article 12 applies only to cases where the vessels "are crossing so as to involve risk of collision." Even assuming, on the facts found, that these vessels were crossing, so as to involve risk of collision, when they first sighted each other, the Willis "determined the risk" when

she had gone off two points by starboarding, and brought green light to green light. This is the point in judgment in *The Earl of Elgin*, L. R. 4 P. C. App. 1.

But it is urged for the Jones that the porting mentioned in the fifth finding was a porting *in extremis*, and, therefore, excusable. The finding is not to that effect. The changes made by the Willis are found to have been proper and were proper. This being so, no fault of the Willis induced the final act of porting by the Jones. To be an excusable mistake *in extremis*, a pardonable manœuvre, though contributing to or inducing a collision, when the manœuvre would have been faulty if not excusable, it must be one produced by fault or mismanagement in the other vessel. *New York & Liverpool Steamship Co.* v. *Rumball*, 21 How. 372, 383; *The Nichols*, 7 Wall. 656, 666; *The Carroll*, 8 Id. 302, 305; *The Dexter*, 23 Id. 69, 76; *The Bywell Castle*, 4 P. D. 219. The last case is a well-considered judgment by Lords Justices James, Brett and Cotton, in the Court of Appeal, and the rule there formulated is, that " where one ship has, by wrong manœuvres, placed another ship in a position of extreme danger, that other ship will not be held to blame if she has done something wrong, and has not been manœuvred with perfect skill and presence of mind."

. On the whole case, we are of opinion that

*The decree of the Circuit Court must be affirmed, but without interest on the amount of that decree.*