THE STRATHAY.[1]

THE YOUNG AMERICA.

PUTNAM and another *v.* THE YOUNG AMERICA.

(*District Court, S. D. New York.*  May 1, 1886.)

1. TOWAGE—GROUNDING—PILOT IN CHARGE OF NAVIGATION — ASSUMPTION OF AUTHORITY BY TUG—SUBSEQUENT ACCIDENT—LIABILITY.
   The tug A. was towing the bark S. upon a hawser eastward through Hell Gate on the flood-tide.  The bark had a Hell Gate pilot on board, who was in control of the navigation.  It was the tug's duty to govern herself by the bark, and to keep ahead of her as nearly as possible.  The tug was following another tow from 500 to 600 yards distant, consisting of a ship towed between two tugs.  Both tows were intending to go through the channel east of Flood rock.  As the tow ahead neared Flood rock it sheered to the starboard somewhat across the east channel.  The captain of the tug A. observing this, and thinking it would be unsafe to follow through the east channel, when about 500 yards from Flood rock, and in mid-river, starboarded his helm to go through the north channel, without consulting the pilot.  The pilot on the bark at once objected to this change; but the other persisting, he quickly acquiesced, and starboarded the helm of the bark.  In swinging, the keel of the bark struck the rocks of the middle reef, and injured the schooner, so that she afterwards sank.  *Held,* that the captain of the bark was in fault in taking into his hands the control of the navigation of the tug, by changing his course without notice to the pilot, and in insisting upon that change without the pilot's consent.  The change of course was therefore at his risk, and the grounding was the fault of the tug.

2. SAME—SITUATION IN EXTREMIS—ERROR OF JUDGMENT BY PILOT.
   Had the pilot on the bark immediately acquiesced in the tug's maneuver, the schooner would probably have escaped; but that was found on the facts to have been more dangerous than to have kept on.  *Held,* no defense to the tug, as the latter, in adopting, without authority, a dangerous maneuver, thereby put the pilot in a situation *in extremis,* in which even an error of judgment, on his part, had there been any such error, was not a legal fault.

*Jas. K. Hill, Wing & Shoudy,* (*H. Putnam,*) for libelants.

[1] Reported by Edward G. Benedict, Esq., of the New York bar.

*Wilcox, Adams & Macklin,* for claimants.

BROWN, J.   During the afternoon of the twenty-ninth of January, 1886, as the bark Strathay was being towed by the steam-tug Young America up the East river, upon a hawser about 50 fathoms in length, going eastward through Hell Gate, her keel struck upon the rocks of the middle reef, and was broken, causing such a leak that she afterwards sank.   The day was pleasant; the tide about half flood.   The tug and tow went up the west side of Blackwell's island, following the ship Alfred Watts at a distance of about one-third of a mile, which was likewise bound through Hell Gate, and was in tow of two tugs lashed along-side of her.   The tide ran from three to four knots. The progress of the Watts through the water was slow; and the Young America, though she checked her speed occasionally, and was going only at the rate of about one and one-half knots through the water, gained somewhat upon the ship.   Both were intending to go through the easterly channel, between Flood rock and the Astoria shore, which is about 700 feet wide.   When the ship had reached a point in the usual course about 300 feet to the southward and eastward of Flood rock she took a sheer to starboard.   The Young America at this time was from 500 to 600 yards astern of the ship.   The captain of the Young America, observing the sheer, and deeming it imprudent to follow on after the ship through the east channel, starboarded his wheel for the purpose of turning to the left, and thence around through the north channel.   Before starboarding his wheel the course of both the tug and the bark had been already directed towards the easterly channel, and they were fully half the distance across from the New York shore to the end of Blackwell's island.   The bark had on board, besides her officers and crew, a special Hell Gate pilot, and also a Sound pilot.   The established custom and duty, as between the tug and tow, in such cases are for the Hell Gate pilot to control and direct the navigation through Hell Gate; and for the tug to keep ahead of the tow as nearly as possible, and to govern her course and action by the course of her tow.   The Hell Gate pilot on board the bark had shaped his course for the east channel, and the tug had done the same.   The pilot had not starboarded, nor given to the tug any order to starboard.   On seeing the tug going to port under a starboard helm, however, he understood the tug's intention to attempt to go by the north channel; and he immediately rushed upon the house, and hailed the tug, saying: "You can't do it!" to which the reply came immediately: "I can do it; starboard your helm."   This was answered by a renewed protest that the tug could not do it, and the previous reply was repeated.   The tug meanwhile kept on turning down the stream to pull the bark around, down stream, and away from the rocks towards which the tide was sweeping her.   After the second reply from the captain of the tug the pilot of the bark immediately put his helm hard a-starboard; but in swinging around the

keel struck the rocks, and was broken, as above stated. After swinging further to the westward she drifted up with the tide, stern first, through the north channel.

I have no doubt, from the evidence, that there was a strong sheer of five or six points on the part of the ship. It was broken by the action of the tugs on each side of her, which put their engines in contrary motion, so as to turn the ship about. Her headway through the water was thereby checked until, according to the evidence, she merely drifted with the tide. When the first sheer to starboard was broken, she took something of a sheer to port, and in that manner, with little if any headway, drifted through the easterly channel to the upper end of Flood rock, where she got straightened, and resumed her progress.

The width of water in the east channel available for vessels of a draught of 22 or 23 feet, like the bark in question, is not over 600 feet; and there is no doubt that it would not only have been contrary to the special rule of the inspectors, (rule 7,) but dangerous, to attempt to pass by the ship in the east channel when the latter was under such a sheer as that described.

There is a great deal of very loose and inaccurate testimony in the case on the part of the claimants, in regard to the intervals of time and distance, the navigation of the ship under her sheer, and the risks likely to be encountered by the bark, involving great exaggerations and inconsistencies, for the evident purpose of exonerating the captain of the Young America from blame. All agree, however, that when the ship took her sheer the bark was a considerable distance astern,—most of the witnesses say from 500 to 800 yards; and, as the bark was at that time about abreast of the upper end of Blackwell's island, it is pretty certain that the distance was not less than 600 yards. This distance was so great, and the speed of the tug and bark through the water was so small, that there was, in my judgment, no actual danger whatever in the tug's keeping on and following the ship at the tug's slow rate of speed. No one estimates the speed of the tug through the water at above one and one-half knots. Her captain testified that it was only one-half a knot. The tide, as it has been often proved before me, flows true, on the flood, through the easterly channel, from the point at which the ship had arrived when she took her sheer. According to the testimony in this case, it was then running from three to four knots. In other cases before me the testimony has shown a much greater speed. But, assuming every doubtful point in favor of the tug; that the tide ran only at the lowest rate here testified to, namely, three knots; that the speed of the ship through the water was entirely checked, which could not have been the fact, except for a very small portion of the time; and assuming that the tug was going at the highest rate estimated, namely, one and one-half knots through the water,—under all these conditions, the tug would have run by land only 450 feet while the

ship was going 300 feet; so that the ship, which was 1,500 feet, or 500 yards, ahead when she commenced her sheer, would have been carried by the tide alone 1,000 yards before the bark could have reached her, even without the tug's slackening speed. The tide alone, therefore, would have carried the ship beyond Hallett's point, a distance more than three times the space in which there was any danger from Flood rock, before the tug would have reached her. This rock does not extend more than 1,000 feet from the point where the sheer began, and must have been passed within three minutes, and before the tug could have overtaken the ship.

These facts are indisputable. They were easy to be perceived and estimated upon the spot. It was evident at the time that, notwithstanding the sheer, the ship must pass through the dangerous part of the passage long before the bark could reach her. In the situation in which the Hell Gate pilot on the bark found himself when the sheer was observed, his course being already shaped for the easterly channel, the circumstances did not require him to resort to the dangerous maneuver of changing his course to attempt the north channel, in the face of the rocks ahead. From the result, it may be admitted that if the bark had starboarded instantly, as soon as the tug starboarded, she would probably have just barely escaped injury. But the attempt to change her course was highly dangerous,—far more so than keeping on. The pilot of the ferry-boat near by, familiar with the waters, expected the accident when he saw the attempt, and he hailed the tug in order to prevent it. As the event turned out, I have no doubt that had the view of the Sound pilot to keep ahead, or the view of the captain of the tug when he starboarded, been followed, without embarrassment from the other, no accident would have happened. The accident arose from divided counsels, and from the tug's assuming the control of the navigation without leave. Even if there were no rule determining who should control in such cases, there can be no doubt, upon the facts above recited, that the Hell Gate pilot had the better judgment, and was incurring less danger in following the ship than in attempting a change of course. But the rule is well established that the navigation is under his control, and not under the control of the tug, and that the latter is bound to follow, and not to lead. The circumstances were all as plainly in view of the pilot of the bark as of the captain of the tug. The tug-boat herself was in no danger; she was capable of taking care of herself in any situation. The Hell Gate pilot was responsible for the bark. It was a clear breach of duty on the part of the captain of the tug, and without any legal excuse or justification, that he took into his own hands the control of the navigation of the bark, by changing the course of the tug and bark without any previous notice to the Hell Gate pilot, and to insist upon that change, as he did, without the other's consent. It was therefore legally at his risk and peril, and the grounding must therefore be held the fault of the tug.

It constitutes no defense that if the pilot had immediately acquiesced in the tug's maneuver she would have escaped. The pilot on board the bark was bound to exercise his own best judgment. He was on board the bark for that purpose, and for nothing else. That was his legal obligation to the bark; and it would have been at his own risk had he surrendered that judgment to the captain of the tug without necessity. The maneuver attempted by the tug was, as I have said, clearly a dangerous one,—apparently far more dangerous than to keep on. When the pilot shouted, "You can't do it," had the tug returned to the course of the bark, as it was her duty to do, no accident would have happened. There was no obstinate persistence, however, on the pilot's part. He acted rapidly. The hails were in quick succession. The time of the delay must have been less than half a minute; and when he saw that the tug kept on and insisted upon her maneuver, he immediately put his helm hard a-starboard. In this the pilot certainly did not exceed the limits of a reasonable assertion of his own superior authority and judgment, and he yielded as soon as it was perceived that the tug insisted upon her course. The captain of the tug, in wrongfully assuming the control of the navigation, took upon himself the risk of divided opinions, and of a reasonable time necessary to procure the pilot's concurrence. In adopting, without authority, a dangerous maneuver, the tug put the pilot in a situation *in extremis;* and even if the pilot made an error of judgment in not acquiescing instantly, and without protest, that was not a legal fault. The fault in such cases is legally his alone who wrongfully brings the other into that situation. *The Elizabeth Jones,* 112 U. S. 514, 526; S. C. 5 Sup. Ct. Rep. 468; *The Bywell Castle,* 4 Prob. Div. 219. But, as above observed, there was not, in my opinion, any error of judgment even on the part of the pilot in his protest. To keep on was apparently the safer course; but he speedily acquiesced when he found he could not help himself, and from that moment he did everything that he could to aid the tug. The bark is, in my judgment, without legal fault, and the libelant is entitled to a decree, with costs.

In this decision I exclude all reference to the damages to the cargo, since that is no longer represented in the case; and the subsequent conduct of the bark leaves it an open question whether she is not at least jointly responsible for the damages.