COMPANIA DE NAVEGACION CRISTO-BAL, S. A. v. THE LISA R. et al.

HUGHEY et al. v. THE IONIAN EXPLORER et al.

GRAIN PROCESSING CORP. v. THE IONIAN EXPLORER et al.

Nos. 1787–1789.

United States District Court
E. D. Louisiana, New Orleans Division.

May 22, 1953.

Chaffe, McCall, Toler & Phillips, Edmund, McIlhenny, New Orleans, La., proctors for Compania de Navegacion Cristobal, S. A., and S. S. Ionian Explorer.

Lemle & Kelleher, Selim B. Lemle, New Orleans, La., proctors for respondent and cross-libellant Blue Stack Towing Co. and Tug Lisa R.

Terriberry, Young, Rault & Carroll, Alfred M. Farrell, Jr., New Orleans, La., proctors for libelants, Mike Hughey, Super Test Oil Co., Inc., and Grain Processing Corp.

WRIGHT, District Judge.

These libels, consolidated for the purpose of trial, arose out of a collision in the Mississippi River several miles below the City of New Orleans at a point called Huling Light. Huling Light is situated on the east, or left descending bank of the river and marks a bend in the river. Involved in the collision was the steam tank vessel of Panamanian registry and ownership, Ionian Explorer, and a flotilla made up as a unit composed of the Diesel Tug Lisa R and the barges Supertest No. 2 and GPC. The litigation started with a libel by the owner of the Ionian Explorer, Compania de Navegacion Cristobal, S. A., against the Tug Lisa R and her owner, Blue Stack Towing Company, a cross-libel by Blue Stack against Compania, a libel by the owner and charterer of the Supertest No. 2 against the Ionian Explorer and Lisa R and a libel by the owner of the GPC against the Ionian Explorer and the Lisa R.

The Tug Lisa R was a new Diesel tug powered by a 950-horsepower engine. The Supertest No. 2 was an oil tank barge loaded with gasoline 195 feet in length, 35 feet in width and 10 feet in depth. The GPC, a dry cargo barge, loaded with bulk grain and salt, was 224 feet in length, 40 feet in width and 11 feet in depth. The Supertest No. 2

was made up directly ahead of the tug while the GPC was lashed to the starboard side of the Supertest. The bows of the barges were flush, but the stern portion of the larger and longer GPC abutted abaft the bow of the tug along the tug's starboard side. At the time in question, the early morning of March 17, 1950, under conditions of clear visibility and very little wind, The Lisa R was descending the Mississippi River and headed toward Huling Light. Her engine was slow ahead and the flotilla, with a favoring current of four knots, was making good five knots over the bottom. Both the tug and tow were displaying proper running and towing lights. The Lisa R was being conned by her master who was making his first trip on the river without a pilot.

The Ionian Explorer, a steam tanker 412 feet in length, conned by a river pilot accompanied by the second officer of the vessel was ascending the Mississippi River. She was steaming at full ahead and her speed against the four-knot current was six knots over the ground. Up to and for some time before the collision she was holding the east, or right ascending bank of the river approximately 100 feet off her starboard side, while The Lisa R was farther out toward the middle of the river angling to port in the direction of the bend at Huling Light. When the vessels first sighted each other at a distance of approximately 3 miles they were almost equidistant from Huling Light. The collision occurred 200 feet below Huling Light and about 100 feet off the east bank. The river at this point is 2700 feet wide.

The river in the area of Huling Light runs generally north and south, making the east bank the left descending and the west bank the right descending. An obtuse bend in the river at Huling Light poses the question as to whether or not Article 18, Rule 1, of the Inland Rules, 33 U.S.C.A. § 203, requiring a port to port passing when vessels are approaching each other head on or nearly so, is applicable in the area of the bend. Considerable evidence was introduced to show the custom in navigating bends in the Mississippi River is that the descending vessel runs the bends and the ascending vessel runs the points. The descending vessel by running the bends receives the full benefit of the favoring current as well as the larger area in which to navigate, it being admitted that a descending vessel in a four-knot current is less maneuverable than an ascending vessel in the same current. Also, by running the points an ascending vessel can avoid the main thrust of the current, it appearing that the current in passing a point tends to run wide into the bend.

From the evidence it is clear that when the vessels first sighted each other, The Lisa R, being the downbound vessel, was shaping her course so as to run the bend at Huling Light in conformity with the river custom. She was therefore attempting to approach the east or left descending bank of the river so that ascending traffic would be left to starboard instead of to port as required by the Inland Rules. The Ionian Explorer, on the other hand, was obviously holding fast to the east bank and intended to leave downbound river traffic to port in compliance with the Inland Rules. This difference in opinion as to how the bend should be navigated brought the vessels into such proximity as to create a danger of collision. It was not, however, the proximate cause of the collision. The collision was caused by the failure of both vessels to navigate in accordance with the fundamental principles of good seamanship in the presence of danger of collision.

As is usual in cases of this type, the stories told by the witnesses for each vessel are extremely difficult to reconcile. The Ionian Explorer claims that as the vessels approached each other with The Lisa R bearing 30 degrees on her port bow and showing her a green light, The Ionian Explorer initiated the passing signals with one blast, followed shortly thereafter by another when the first was not answered. The Lisa R, on the other hand, contends that she initiated the passing signals with two blasts and receiving no reply, came back

again a minute later with two blasts.[1] The Ionian Explorer admits receiving one two-blast signal from The Lisa R following the second one-blast signal of her own. This she claims was a prohibited cross signal and on receiving the same, she blew the danger signal and came back again with one blast, which one blast was returned by The Lisa R. The Lisa R admits receiving the danger signal following her second two blasts and admits assenting to the following one blast from The Ionian Explorer.

When The Lisa R assented to the port to port passing, the distance between the vessels had closed to 3,000 feet and it was three or four minutes before the collision occurred. At the time The Lisa R's engine had been stopped and she was more or less floating with the current of the river. On assenting to the port to port passage, The Lisa R put her helm full right and came ahead with her engine on slow. When it appeared to her master that The Lisa R would not clear The Ionian Explorer on this heading, The Lisa R sounded the danger signal, backed full astern and put her helm hard left. While The Lisa R was engaging in these maneuvers, The Ionian Explorer continued to hold her course and speed of full ahead and did not shut down her engine and back full astern until one minute before the vessels collided.

■ It is clear that the well-established custom in navigating the bends in the Mississippi River is as alleged by The Lisa R. This custom has been judicially recognized. The Stephen R. Jones, 5 Cir., 27 F.2d 208; The Norne, 5 Cir., 59 F.2d 145; The John D. Rockefeller, 4 Cir., 272 F. 67. It is not so clear as to what bends the custom applies. The weight of the evidence in this case, however, indicates that the bend at Huling Light was such a bend as would come within the custom. Consequently, the ascending vessel instead of holding the east bank and working for a port to port passing with the descending vessel, should favor the west bank so as to leave the descending vessel to starboard. Therefore, while not the proximate cause of the collision, it was fault on the part of The Ionian Explorer to be holding the east bank in navigating Huling Point.

■ It was even greater fault, however, for The Lisa R to insist on a starboard to starboard passage with The Ionian Explorer in the circumstances of this case. The Lisa R claims she first saw The Ionian Explorer when The Ionian Explorer was two miles below Huling Light while she herself was two miles above, that at the time The Ionian Explorer was holding the east bank and that she continued to hold the east bank up to the time of the collision. Further, The Lisa R admits that The Ionian Explorer bore 30 degrees on the starboard bow of The Lisa R and that the green light of The Ionian Explorer was never seen by The Lisa R until after the collision. In other words, The Lisa R, though staring squarely in the face of the red port light of The Ionian Explorer, continued to navigate across the bow of The Ionian Explorer toward the east bank of the river in spite of the fact that The Ionian Explorer gave no indication whatever at any time that she intended to depart from her position 100 feet from the east bank. With 2600 feet of the Mississippi River in which to navigate The Lisa R insisted on driving a wedge between the east bank and The Ionian Explorer.

This fault on the part of The Lisa R is aggravated by the fact that after working for and signaling for a starboard to starboard passage, she finally assented to a port to port passage and failed to comply with her agreement. Even her effort to comply was feeble. Knowing she was without way in a four-knot current, she put her engine only slow ahead when the situation obviously called for all the power she had. Since The Lisa R was 3,000 feet and three or four minutes from the collision at that time, her assent to the port to port passage cannot be considered as being in extremis. Even so, she was in a predicament at least partly of her own making. The Elizabeth Jones, 112 U.S.

---

1. During the interval between the two two-blast signals the mate of The Lisa R suggested a port to port passage to the master of the tug.

514, 5 S.Ct. 468, 28 L.Ed. 812; The Protector, 2 Cir., 113 F. 868.

 The Ionian Explorer stands no better than The Lisa R. On her own testimony she saw nothing but the green starboard running light of The Lisa R [2] except for one short moment when The Lisa R was attempting to carry out the port to port passage. Except for that one moment, the actions of The Lisa R gave every indication that The Lisa R was intent on crossing her bow. Her first signal went unanswered, she received an illegal cross signal, she received a danger signal, yet she maintained her course and speed until one minute before the collision when her mate and pilot actually saw or thought they saw an obstruction in the river between The Ionian Explorer and The Lisa R. It may be admitted that if we attempt to weigh the fault, the fault of The Lisa R would be greater. But it is also clear that if The Ionian Explorer had complied with the primary requirement of good seamanship by stopping and reversing until the danger of collision had subsided, the collision might not have taken place. In this connection it may be well to repeat again the injunction of The New York, 175 U.S. 187, 20 S.Ct. 67, 72, 44 L.Ed. 126. Perhaps, if mariners would read it again and again, it may finally come to have the desired effect:

"She should have stopped her engines after the second signal, and, if necessary to bring her to a complete standstill, have reversed them. Nothing is better settled than that, if a steamer be approaching another vessel which has disregarded her signals, or whose position or movements are uncertain, she is bound to stop until her course be ascertained with certainty. (Citing cases.) * * *

"The lesson that steam vessels must stop their engines in the presence of danger, or even of anticipated danger, is a hard one to learn, but the failure to do so has been the cause of the condemnation of so many vessels that it

would seem that these repeated admonitions must ultimately have some effect."

Both to blame.

2. The starboard hand rule for crossing vessels is not applicable to vessels coming around bends in channels or rivers. The Victory, 168 U.S. 410, 418, 18 S.Ct. 149, 42 L.Ed. 519.