INDUSTRIAL MARINE SERVICE, Libellant,

v.

AMERICAN BARGE LINE COMPANY, Inc., and THE GUADALCANAL, her engines, tackle, etc., Respondent.

JONES & LAUGHLIN STEEL CORPO-RATION, Libellant,

v.

THE M/V JAMES E. GRAHAM and THE M/V ROBERT R. GIPSON, their engines, tackle, apparel, etc., and Industrial Marine Service, Inc., Respondent.

PAN-AM SOUTHERN CORPORATION, Libellant,

v.

AMERICAN BARGE LINE COMPANY and THE GUADALCANAL, her engines, tackle, apparel, furniture, etc., Respondent.

Nos. 2402, 2474, 2423.

United States District Court
E. D. Louisiana,
New Orleans Division.

June 21, 1957.

Wheeler, Stewart, Exnicios & Mestayer, Thomas B. Wheeler, New Orleans, La., for libellant in No. 2402 and respondent in Nos. 2423 and 2474.

Lemle & Kelleher, Charles Lugenbuhl, New Orleans, La. for libellant in No. 2474 and respondent in Nos. 2402 and 2423.

Phelps, Dunbar, Marks, Claverie & Sims, J. Barbee Winston, New Orleans, La., for libellant in No. 2423.

J. SKELLY WRIGHT, District Judge.

The collision which is the base of this litigation occurred midway between Lookout Light and Island 34 Light in a four mile long crescent-shaped bend in the Mississippi River in the state of Tennessee. The issue to be determined herein is one of liability for the various claims arising out of the incident.

On the night of December 13, 1952, the 810-HP single screw Diesel towboat James E. Graham and 1800-HP twin screw Diesel towboat Robert R. Gipson, lashed together, were bound up the Mississippi River pushing two loaded tank barges in tandem. The barges were approximately 45 feet wide with a combined length of 472 feet which, including the length of the towboats, made a unit approximately 558 feet long and 45 feet wide. The 2000-HP twin screw steam towboat Guadalcanal was proceeding down the Mississippi River pushing a tow consisting of 17 barges made up in three tiers and six strings with an overall width of approximately 160 feet. The tow was 507 feet in length, which, with the Guadalcanal, made the unit approximately 687 feet long.

The collision occurred at approximately 9:30 P.M. when the starboard quarter of the face barge [1] in the starboard string in the Guadalcanal tow struck the starboard bow of the lead barge in the Graham-Gipson tow. The channel at the point of collision was 600 feet wide and, at the time of collision, the Graham-Gipson tow was stopped and nosed into a false point or indentation in the right descending bank of the river. The night was clear, there was no wind, and the

current of the river was downbound at four to five miles per hour.

At approximately 9:10 P.M. those aboard the Graham-Gipson tow saw the loom of the lights of a downbound tow, later learned to be the Guadalcanal, around the bend. At the time there were a pilot and deck hand in the wheel house of the Graham and in the wheel house of the Gipson. While both vessels were supplying power for the tow, the steering was by the Graham. After some difficulty, the captain of the Graham contacted the Guadalcanal by radio. At the time Philpott, the captain of the Guadalcanal, was the only one in her wheel house. Neff, captain of the Graham, suggested a starboard-to-starboard passing to which Philpott agreed after asking and being told there was space to pass in the bend. Neither captain advised the other of the size of his tow.

The vessels came in sight of each other at a distance of approximately two miles at which time the agreement to pass starboard-to-starboard was confirmed by an exchange of two blasts by each tow. On sighting the Guadalcanal, the Graham-Gipson tow slackened speed and headed for the right descending bank, eventually coming to a stop and holding the nose of the tow some 25-30 feet off the bank by the use of the engines of the tugs. The searchlight of the Graham was then placed on the head of the tow. At the time the Graham-Gipson tow came to a stop, the head of the Guadalcanal tow was still several hundred feet upriver.

The Guadalcanal, after exchanging whistle signals for starboard-to-starboard passing, continued downbound, making good approximately nine miles per hour at full speed, Philpott playing the searchlight of the Guadalcanal on five buoys which marked a reef and formed the left descending side of the channel. The right descending side of the channel was the fast caving bank of the river itself which was deep, although

---

[1] The face barges in a tow being pushed are those in the tier made up directly to the towboat.

possibly spotted with stumps, right up to the bank.

The bend in the river was to port for the downbound vessel and Philpott determined to steer it, using the power from his steam tug to overcome the tendency of the current to swing his tow into the bend, or right descending bank of the river. Instead of keeping the head of his tow close to the buoys and parallel to the thread of the stream, Philpott allowed his tug to angle across the channel, thus opening the side of his tow to the current, with the result that the after part of his tow tended toward the right descending bank of the channel in the direction of the Graham-Gipson tow. Philpott, afraid that his tow might not clear the upbound tow, rang for and got full astern for approximately one to two minutes before the collision. With the Guadalcanal's engines moving in reverse, the tow flanked broadside to the current, bringing the after barge in her starboard string in contact with the starboard bow of the Graham-Gipson lead barge.

Philpott, captain of the Guadalcanal, while admitting that the Graham-Gipson tow was stopped at the time of the collision, testified that it, nevertheless, was taking up 200 feet of the 600-foot channel and that it was the failure of the Graham-Gipson tow to accord him more than 400 feet of the 600-foot channel which caused the collision. He denies that reversing his engines tended to bring his tow broadside to the current and into the upbound, then stopped, tow. He further claims that the Graham-Gipson tow should have held back several hundred yards downstream from the point of collision where, he said, the channel was wider.

Philpott's charge that the collision was caused by the failure of the Graham-Gipson tug to hold up closer to the right descending bank is obviously an afterthought because in his casualty report to the United States Coast Guard filed immediately after the collision, he stated that the collision was due "to the head of the (his) tow sheering away from the reef in a close channel." He later admitted in his testimony before the Coast Guard that his tow "actually wasn't out against the buoys" where it should have been for the agreed starboard-to-starboard passage. The truth of the matter is Philpott did not have on board, as did the Graham, Navigation Bulletin No. 102, issued December 12, 1952, which showed there was plenty of water for maneuvering right up to the buoys. If Philpott had had this information, he probably would not have been so shy of the buoys. Philpott's testimony that the collision occurred before his order to reverse the engines was complied with is also incredible. His chief engineer, who placed the engines in reverse, said that they were in that condition from one to two minutes before the collision and an engine room striker on the Guadalcanal estimated the time as two and one-half minutes. No engine log book was kept.

Philpott's desire to minimize the time the Guadalcanal was in reverse is understandable in view of the well-known fact that downbound vessels in the Mississippi River, pushed by the current, tend to flank broadside into the bends, and this flanking action is accelerated by placing the vessel in reverse.[2] Placing the engine of the Guadalcanal in reverse was what actually caused the collision. Undoubtedly, if Philpott had continued

---

**2.** Prior to the advent of diesel towboats of great horsepower and during the time of the paddle wheel steamboat, it was customary for a downbound tow to flank its barges around a bend. See The Stephen R. Jones, 5 Cir., 27 F.2d 208; The Norne, 5 Cir., 59 F.2d 145; The John D. Rockefeller, 4 Cir., 272 F. 67. In a flanking maneuver the maneuvering vessel proceeds slowly into a bend, runs the head of its tow up close to the bight of

the bend, and then by reversing its engines swings the tow around to make the point. Since the advent of diesel towboats a great many pilots, if not the majority, prefer to steer a bend. In a steering maneuver the towboat is brought full ahead, and with adequate horsepower and twin propellers a pilot is able to steer a bend without reversing his engines or backing his tow.

steering his tow around the bend, it would have passed close to, but it would not have collided with, the Graham-Gipson tow. And if the head of his tow had been out against the buoys where it should have been, the passage would not have been close, so any in extremis situation which existed was of the Guadalcanal's own making. The Elizabeth Jones, 112 U.S. 514, 5 S.Ct. 468, 28 L. Ed. 812.

Philpott's complaint that Neff, captain of the Graham, misled him about the width of the channel when he agreed to a starboard-to-starboard passing is also unfounded. A 600-foot channel is not necessarily a narrow channel and there was room for the tows to pass safely. Moreover, Philpott did not advise Neff of the size of his tow and so Neff was in no position to appraise the width of the channel in relation to the Guadalcanal tow. He knew his own tow was only one barge wide and would take up very little channel room. There was no reason for him to assume that the Guadalcanal

was descending with a tow six barges wide. It would seem that if Philpott was concerned about narrow channels, he should have advised Neff of the size of his tow.

The navigation of Neff was without fault. He initiated the passing signal as is required of the ascending vessel by the Pilot Rules [3] for the Western Rivers and the Red River of the North, which control in this area. Philpott assented to the starboard-to-starboard passage. It is a little late now to complain that Neff violated the Narrow Channel Rule [4] by failing to hold back. Neff put his tow in the widest part of the channel available to him after sighting the Guadalcanal, and stopped within 25–30 feet of the bank as required by the Narrow Channel Rule, thus allowing the Guadalcanal more than 500 feet of the 600-foot channel in which to maneuver.

The collision occurred through the sole fault of the Guadalcanal. Decrees accordingly.

3. Rule 18(b) reads:

"When an ascending steam vessel is approaching a descending steam vessel on a river, the signals for passing shall be one distinct blast of the whistle by each vessel if passing port to port, and two distinct blasts of the whistle if passing starboard to starboard.

"The pilot of the ascending steam vessel shall give the first signal for passing, which shall promptly be answered by the same signal by the pilot of the descending steam vessel, if safe to do so, and both shall be governed accordingly; but if the pilot of the descending steam vessel deems it dangerous to take the side indicated by the ascending steam vessel, he shall immediately signify that fact by sounding four or more short and rapid blasts, the danger signal, and it shall be the duty of the pilot of the ascending steam vessel to answer by a similar danger signal and the engines of both shall immediately be stopped and backed, if necessary, until signals for passing are given, answered, and understood. After sounding the danger signal by both vessels, the pilot of the descending steam vessel shall indicate by his whistle the side on which he desires to pass, and the pilot of the ascending steam vessel shall govern himself accordingly, the descending steam vessel being entitled to the right-of-way.

"The pilot of the descending steam vessel shall not blow the first signal, except that if the other vessel has not whistled when the steam vessels, or the forward end of their tows, if being pushed ahead, are within one-half mile of each other, he shall blow the first danger signal, which shall be promptly answered by a danger signal by the ascending vessel; but whether answered or not, the pilot of the descending vessel shall indicate the side on which he desires to pass, and both vessels shall be governed accordingly."

4. 33 C.F.R. § 95.11 reads:

"When two steam vessels are about to enter a narrow channel at the same time, the ascending steam vessel shall be stopped below such channel until the descending steam vessel shall have passed through it; but should two steam vessels unavoidably meet in such narrow channel, then it shall be the duty of the pilot of the ascending steam vessel to make the proper signals, and when answered, the ascending steam vessel shall lie as close as possible to the side of the channel and either stop the engines or move them so as to give the boat only steerageway; and the pilot of the descending steam vessel shall cause his steam vessel to be worked slowly until he has passed the ascending steam vessel."