## Case No. 1,102.

### BATES et al. v. The NATCHEZ.

[Newb. 489.][1]

District Court, E. D. Louisiana. Nov. Term, 1854.

COLLISION —MISSISSIPPI RIVER — ASCENDING AND DESCENDING BOATS—RULES OF NAVIGATION.

1. The general rules of navigation of the Mississippi and the law of Louisiana requires a descending steamboat to keep the middle of the river.

[Cited in Shirley v. The Richmond, Case No. 12,795.]

[See Sinnot v. The Dresden, Case No. 12,908; The Magnolia, Id. 8,958; Goslee v. Shute, 18 How. (59 U. S.) 463.]

2. Although a steamboat descending when near a bend, may have the right to run near the right bank, yet she is guilty of great imprudence in continuing to run near that shore, when she saw another boat ascending, apparently near the same shore.

3. When a boat ascending on the right bank, signals a boat descending, by two taps on her bell, that she intends keeping to the larboard, there is no necessity that the descending boat should run any risk in passing.

[In admiralty. Libel by Bates, Benson & Co., owners of the steamboat Pearl, against the steamboat Natchez, for collision. Libel dismissed.]

Wolfe & Singleton, for libelants.

Durant & Hornor, for respondents.

McCALEB, District Judge. In this case the libelants as owners of the steamboat Pearl, have filed their libel against the steamboat Natchez. to recover the sum of $16,500 damages, which they allege they have sustained in consequence of the sinking of their boat in a collision with the Natchez, at about half past two o'clock in the morning of the first of January, 1854. The collision occurred nearly opposite to what is known as Brusli Landing, in the parish of West Baton Rouge. The Pearl was descending and the Natchez ascending the river. The libel states that the Pearl sank in one minute after the collision, and the testimony of the witnesses shows that she sank almost immediately.

Without commenting at length upon the mass of testimony introduced in evidence, I shall present briefly the prominent facts upon which my conclusions on the questions put at issue by the pleadings and arguments of counsel, have been formed. Fortunately I have not been subjected to the usual difficulty of deciding the case upon the conflicting evidence of the officers of the two boats alone. Several disinterested witnesses have

---

[1] [Reported by John S. Newberry, Esq.]

been examined. Some of these witnesses were attentive spectators of the collision, from the banks of the river, and give for the most part a clear and concurring account of the situation of the boats in the river and the circumstances of the disaster. Their testimony substantially agrees with evidence given by the officers of the Natchez, and has led my mind to the conclusion that the libelants have failed to make out such a case as entitles them to relief from this court.

In the first place, it is extremely doubtful whether the signals were given on the Pearl at all; and if they were I am satisfied they were not heard on board the Natchez. The witnesses on the latter boat concur in declaring that they heard no signal bells from the Pearl, and the witnesses who were on shore at the time of the collision, testify to the same effect. The witness Hart (the overseer on Mr. Stewart's plantation) says that he heard the "bell of the Pearl tap about three seconds before the collision. You could scarcely distinguish between the time of the tap and the crash." It is needless to say that a signal given at such a moment was too late to give the necessary warning to the other boat.

In the next place, I am satisfied from the evidence, that the Pearl was not descending in her proper place in the river. The general rules of the navigation of the river and the law of Louisiana on the subject, require a descending boat to keep in the middle of the river; but admitting that in this instance, she was, according to the opinion expressed by the witness Orr, entitled to run down the bend, and that she would have been in her proper place at the distance of 200 yards from the Brusli Landing, it is yet obvious that she was guilty of great imprudence in continuing to run so near to the right bank descending, when she saw another boat ascending apparently very near the same shore. The witness Orr testifies that at the point of collision there are 800 yards width of good navigable water, and there was certainly no necessity of running any risk in passing an ascending boat, whose signals of two taps repeatedly given, and indicating her determination to keep to the larboard, were distinctly heard: for while we are left in doubt whether any signals were given on board the Pearl, it is rendered perfectly certain by the testimony of the libelants, that the taps from the larger and louder bell of the Natchez were distinctly heard by the pilot of the descending boat. Instead of obeying those signals and keeping out in the middle of the river, we find the Pearl continuing to run so close to the right bank descending, that she came in collision with the Natchez so near to that bank that when the pilot of that boat turned her bow out at the moment of the collision, her stern was against the shore. This fact contained in the testimony of the pilot Dunboy, is corroborated by that of Hofroge, who was on shore at Brusli Landing, and by that of Sands, who was a passenger on the Natchez. It is furthermore corroborated by Lisk, who went to the place of the collision with his diving bell with the view of saving the wreck. This witness declares that he found that the bow of the Pearl was about fifty or sixty yards from the shore. The pilot of the Pearl, on the contrary, testifies that at the time of the collision, she was 150 yards from the Brusli shore. When we take into consideration the fact that she sunk almost immediately after the collision, it is difficult to believe that the testimony of this witness can be correct.

It is by no means clearly established by the evidence, that the engines of the Pearl were stopped before the collision. I am satisfied that she had headway, and that her sinking was the consequence of a concussion produced by her own motion; for the evidence is very strong to the effect that the Natchez had not only stopped her progress, but was actually backing at the moment of the collision. Much stress is laid by the proctors of the libelants upon the fact that the Natchez was running up near the left shore ascending before she reached the Brusli Landing. But the witness Orr examined on their behalf, shows that she had a right to cross from the bar shore, when she came up as far as the Brusli Landing; and if she was already over before the Pearl could reach that point, what just ground of complaint can the latter have? The evidence is clear that she was plainly visible running up close along the western shore—so close that the witness Dr. Vaughn, who was riding along the bank on horseback at the time, thought she had made a landing and was just getting under way again. The evidence is equally clear that she continued regularly on her course, without crossing the track of the descending boat, and that she repeatedly gave her signals in accordance with the rules established by the inspectors, indicating distinctly her determination to keep the shore on which she was running. There could be no mistake at any moment from the time she was first descried by the pilot of the Pearl, as to her real position in the river. After an attentive examination of all the evidence, I am unable to discover any fault on the part of the officers of the Natchez. They seem to have managed their boat with prudence and skill; and their exertions after the collision, in rescuing passengers and others from the sinking boat, entitle them to the commendation of this court.

The libel must therefore be dismissed, with costs.