MAGEE, The SALLY. See Cases Nos. 12,259–12,261.

---

## Case No. 8,946.

### The MAGENTA.

[2 Abb. U. S. 495.] [1]

Circuit Court, D. Louisiana.  April Term, 1870.

COLLISION—CUSTOM ON RIVER—LOCATION OF LOOKOUT—BOTH IN FAULT—DAMAGES.

1. The custom of steamboats navigating the Mississippi river, in respect to directing their course when meeting each other.—explained.

2. Neglect on the part of a pilot of a river steamboat to lay her course, when approaching another boat, in conformity to the well settled custom of boats plying upon that river; or the failure to keep a proper lookout.—e. g., when (especially at night) the man on the lookout is stationed in the pilot-house behind the steamer's chimneys, instead of on the hurricane deck, in front of them.—is a fault in navigation which exposes the steamboat to liability for a collision occurring in consequence.

3. Where both of the colliding vessels are in fault of the collision, the aggregate damages sustained by the two should be shared equally between them.

[Appeal from the district court of the United States for the district of Louisiana.]

E. C. Billings and A. De B. Hughes, for libelant.

R. H. Marr, for claimant.

WOODS, Circuit Judge. About nine o'clock of the night of November 11, 1865, the steamers Brazil and Magenta collided near Bonnet Carre Point, on the Mississippi river, about thirty-eight or thirty-nine miles above the city of New Orleans. The result of the collision was the sinking and loss of the steamer Brazil and cargo. This suit is brought by the owner of the Brazil against the steamer Magenta to recover for the damage sustained.

There is much conflict of testimony in the case; but the following facts are not disputed,

[1] [Reported by Benjamin Vaughan Abbott, Esq., and here reprinted by permission.]

or are clearly established by the evidence. The Magenta was ascending and the Brazil descending the river. The Magenta being the ascending boat gave the first signal, to wit, two whistles, indicating her purpose to pass to her own left or port side. This was responded to by the Brazil with two whistles, indicating that she understood the signal of the Magenta, that she assented to it, and her own purpose to pass to her own left or port side. So that, had the signals been observed, each boat in passing the other would have presented to her her starboard side. It is also in proof and undisputed, that the custom or common law of the river is, for ascending boats to run the points, and for the descending to run the bends. In other words, the ascending boat takes her course from the point on one side of the river to the nearest point on the other side, thus enabling her to avoid the obstacle of the current to some extent, and sail in the eddy water near the banks and under the point; the descending boat follows the main channel current, or what is known in the law as the "line" of the stream, following the bends, and thus uses the force of the current as well as her steam power to propel her on her course. It is also established that when the steamers first came in sight of each other the Brazil was in the middle of the river rounding Bonnet Carre Point, which is on right bank of the river, and the Magenta was passing Thirty-Five Mile Point, a mile and a half or two miles below, on the left or east bank. It also appears that the bow of the Brazil collided with the starboard side of the Magenta forward of the wheel; that her bow for a distance of four or five feet on the larboard side and fifteen or twenty feet on her starboard side was knocked off; and that she sunk on the bar on the right bank of the river from one hundred and fifty to two hundred and fifty feet yards from shore.

As to what part of the river the collision occurred at, there is a conflict of testimony between the libelants and claimants. The libelants say it was about the middle of the river, and the claimants that it was near the right bank, and as close to the bar in the right bank as it was safe for the Magenta to run. The weight of the direct evidence upon this point is about equally balanced, but when the probabilities of the two versions, that of the libelants and that of the claimants, are considered, we think the libelants have the advantage. The pilot of the Brazil is not shown to be non compos mentis, and it seems no person, unless insane, piloting a steamer of two hundred tons burden, after assenting to a signal to pass to the larboard, would port his helm and direct his course to the starboard across the river and run into a steamer of one thousand two hundred or one thousand three hundred tons burden. I am forced to the conclusion, therefore, that the collision took

place near the middle of the river, and that the Brazil did not change her course.

And here is where her fault lies. Her pilot knew or ought to have known the custom of the river, that ascending boats ran the points. The signal of the Magenta indicating that she intended to keep to the left was notice to the Brazil that the Magenta proposed to cross from Thirty-Five Mile Point, and run up the bank along and under Bonnet Carre Point, and it was his duty, instead of stopping his boat, to put his helm a-starboard and direct his course close in on the left bank of the river. If, when the signals were exchanged, he had done this, a collision would have been impossible.

It is very clear from the testimony, that both the captain and the pilot of the Brazil were inexperienced and unfit to have charge of a boat. With skill and prudence on the part of these officers, I have no doubt that a collision might have been avoided.

But it is just as clear that there was fault on the part of the Magenta. When signals were exchanged between the two boats, the officers of the Magenta must have known, or should have known, that a collision was possible; they intended to cross the river and run up under Bonnet Carre Point; they knew that the Brazil was coming down the current of the river, running the bends according to the custom of descending boats, and it was their duty to have a lookout stationed in such a position, on the boat, as to keep the Brazil in view, and give warning of impending danger. According to the testimony of claimants themselves, this was not done.

Carter, the pilot of the Magenta, testifies: "A few moments after exchanging signals, the lights of the descending boat were hidden from witness by the chimneys of the Magenta; this time was probably half a minute, not more than a minute. When I next saw the lights, I discovered that the Brazil, the descending boat, was running directly across the river, square across our bow."

Captain Leathers, of the Magenta, testifies that he and both the pilots were in the pilot-house at the time of the collision. If the chimneys of the Magenta hid the lights of the Brazil from the pilot, Carter, they hid them also from the other pilot and the captain. The proper and usual place for the lookout was on the hurricane deck, in front of the chimneys. No testimony is offered on the part of the claimants to show that a man on the lookout was stationed there, and it is fair to presume that there was none or we should have the fact in the testimony. The pilot-house, behind the chimneys, is not the place for the man on watch, when passing other steamers in the night. If a proper lookout had been maintained on the Magenta, the impending danger of a collision might have been seen, and by good seamanship avoided.

I find, therefore, that both steamers were at fault; that by the exercise of proper watchfulness and skill on the part of either, the collision might have been avoided. In such a case, according to the rules laid down by the supreme court in The Catherine v. Dickinson, 17 How. [58 U. S.] 170, the loss must be divided.

The damage to the Magenta was, according to Captain Leathers, from three to five hundred dollars; and he is the only witness that speaks to the point. I put the damages, therefore, at three hundred dollars.

The testimony as to the damage occasioned by the loss of the Brazil is very conflicting; but after a careful review of the testimony, I am satisfied the court below fixed the damage very near the correct amount, namely, twelve thousand dollars. From one-half this amount, to wit, six thousand dollars, should be deducted the one-half of the estimated damage suffered by the Magenta, namely, one hundred and fifty dollars, leaving the sum of five thousand eight hundred and fifty dollars as the amount of the decree in favor of libelant against the Magenta. Let a decree be entered accordingly, each party to pay his own costs. Decree accordingly.