## Case No. 12,795.

SHIRLEY et al. v. The RICHMOND.

MERCHANTS' MUT. INS. CO. v. The RICHMOND and The SABINE.

[2 Woods, 58.][1]

Circuit Court, D. Louisiana. Nov. Term, 1874.

### COLLISION—LOOKOUT—RULE OF NAVIGATION ON MISSISSIPPI RIVER.

1. A neglect to keep a proper lookout, which does not in any way contribute to a collision, cannot be alleged as a ground on which to recover damages caused by the collision.

[Cited in The Ping-On v. Blethen, 11 Fed. 615.]

2. A neglect of the well established rule, for navigating the Mississippi river, that ascending boats shall run the points, and descending boats the bends, which results in a collision and loss, renders the boat which disregards the rule liable for the damages.

[Cited in Baltimore & O. R. Co. v. Wheeling, P. & C. Transp. Co. 32 Ohio St. 140, 148.]

[Appeal from the district court of the United States for the district of Louisiana.]

About half past two o'clock on the morning of the 11th of February, 1872, the steamers Sabine and Richmond collided with each other a short distance below Twelve Mile Point on the Mississippi river. As a result of the collision, the Sabine sank in about five minutes, and the Richmond received some damage. The owners of the Sabine [J. W. Shirley and others] have filed their libel against the Richmond to recover for the damages sustained by the collision which they place at the sum of $37,500, and charge that the Richmond was solely in fault. The master and owners of the Richmond have filed their answer and cross-libel, in which they claim

---

[1] [Reported by Hon. William B. Woods, Circuit Judge, and here reprinted by permission.]

$12,000 damages from the owners of the Sabine, alleging that the collision occurred through her fault. The Merchants Mutual Insurance Company has filed its libel against both steamers, alleging that the company has been compelled to pay a large insurance loss, and that both steamers were in fault. These two causes were consolidated by order of the court, and were tried and submitted together.

R. H. Marr and B. Egan, for Shirley and others, libellants.

M. M. Cohen and A. Voorhies, for Merchants' Mutual Ins. Co.

E. C. Billings, A. de B. Hughes, L. A. Sheldon and Given Campbell, for the Richmond.

WOODS, Circuit Judge. The main question presented for decision is, Where does the fault which occasioned the collision lie? The prominent facts in the case appear to be as follows: The Richmond left the elevator, in the city of New Orleans, about one o'clock a. m., of the 11th of February, 1872, bound up the Mississippi river. She kept up the east bank of the river as far as Carrolton, and then crossed over and got under, and rounded Nine Mile Point on the west bank of the river. She kept close under the west bank until she reached the Kennedy plantation, about a mile above Nine Mile point and two miles below Twelve Mile point. The claimants say, that from Kennedy's plantation, the Richmond started to make a long crossing of the river towards the east bank, under Twelve Mile point, with a purpose to run up along the east bank, and round Twelve Mile point. The libellants, the owners of the Sabine, say, that the Richmond did not start to cross at the Kennedy plantation, but kept up the west bank of the river to the Waggaman plantation, deep in the bend of the river, opposite Twelve Mile point, and then made a square crossing and came near the east bank, just under Twelve Mile point. In the meantime, the Sabine was descending the river with a cargo, principally of cotton. She rounded Twelve Mile point, on the east bank of the river, and came in collision with the Richmond, just under the point, and between seventy-five and one hundred and fifty yards from the east bank. At the moment of the collision, the Richmond was headed for the east bank, and the Sabine was headed down stream. The stem of the Richmond came in contact with the Sabine on the starboard side, four or five feet aft the flag-staff, and cut through her in the direction of the capstan, a distance of about fourteen feet. The stem of the Richmond was deflected to the starboard by the force of the collision.

The Sabine charges the fault of the collision upon the Richmond:

1. Because she did not cross the river at the usual place, in the usual manner, but ran up deep in the bend to the Waggaman plantation, and from thence made a square crossing to the place of the collision, just under

Twelve Mile point. The evidence to support this claim of the Sabine is entirely from persons who were on board of her. The witnesses that speak to this point, who were upon the Richmond, all say that she commenced to cross at Kennedy's, just above Nine Mile point, which is the usual place to commence crossing at that part of the river. The probabilities favor the theory of the Richmond. No possible motive is shown why the Richmond should take the circuitous and unusual course to run up to Waggaman's, deep in the bend, and then make a square crossing. Duffy, the pilot of the Richmond, testifies that he commenced at Kennedy's to make the usual long crossing, and that he had completed his crossing and was about a mile below Twelve Mile point, and within one hundred and fifty yards of the east bank, when he first saw the Sabine coming around the point. This evidence is corroborated by Cayton, also a pilot on the Richmond, by Court, the mate, by Davies, second mate, and by Williams, Kane and Keheloe. The witnesses for the libellants upon this point speak, not in a positive way, but, with the exception of Howison, the pilot of the Sabine, testify that she "looked" to be coming up the river near the bend shore. These witnesses had, by no means, so favorable an opportunity to know the course of the Richmond as those who were upon her, and whose duty it was to select and control her course; they speak of what appeared to be the course of the Richmond, and their version of the facts is not a probable one, for no motive is shown or can be conceived why the Richmond should run up to the Waggaman place and then make a square crossing. This course would have been unusual, circuitous, unnecessary and dangerous. It is in evidence that Waggaman's, where the crossing was commenced by the Richmond, according to the theory of the libellants, was nearly opposite to, or a little above Twelve Mile point. The river is nearly a mile wide at that place. The Sabine blew her first whistle when she was nearly opposite Twelve Mile point, and the Richmond did not change her course to cross the river until after that whistle. If these are the facts, it was impossible for the Richmond to cross the river and collide with the Sabine two or three hundred yards below Twelve Mile point. I conclude, therefore, that the witnesses for the Richmond give a correct account of her course from the time of leaving Nine Mile Point up to the time of the collision.

2. There is a complaint that the Richmond had two red lights, and not a red and a green one as required by rule 16 for western rivers, and that one of the red lights was on the jackstaff, behind the pilot house. There are several witnesses for the libellants who testify that they did not see the green light, but the evidence is incontrovertible that the Richmond had both a green and red light, each in its proper place. The two clerks of the

Richmond testify that they saw the green light on the starboard chimney after the collision, and the watchman says he took it down in the morning after the collision, lit and burning.

3. Libellants claim that there was no proper look-out on the deck of the Richmond at the time of the collision. But the evidence of Lanz, the steward, Duffy, the pilot, Court, the mate, and Green, the master, of the Richmond all show that both the master and the mate were on the roof before the collision occurred. Court was on the roof when the first signal was blown by the Richmond, which was before she crossed the river from Nine Mile point. This first signal was not blown for the Sabine, but for the cars. The captain was on the roof immediately after the first signal was blown for the Sabine, and remained there until the collision. But even if there had been no look-out, it would not alter the case, for the pilot of the Richmond saw the Sabine as soon as she rounded Twelve Mile point, which was at as early a moment as any man on the look-out could have seen her.

I will now consider the misconduct alleged against the Sabine, in doing which, I shall notice other charges made against the management of the Richmond. It is charged against the Sabine that she was out of her proper place on the river, and that this was the cause of the disaster. The testimony of numerous witnesses shows that it is the common law of the Mississippi river for the ascending boat to run the points, and the descending boat to run the bends; in other words, that the descending boat is required to keep in the main current or follow the thread of the stream, and the ascending boat to keep near the shore, crossing over from point to point so as to shorten the distance as much as possible, and at the same time sail in the eddy water near the banks. This rule is not only spoken of by the witnesses, but has been recognized by the decisions of the courts. Sinnot v. The Dresden [Case No. 12,908]; Bates v. The Natchez [Id. 1,102]; Goslee v. Shute's Ex'r, 18 How. [59 U. S.] 466; The Magenta [Case No. 8,946]; Williamson v. Barrett, 13 How. [54 U. S.] 106; Jones v. Pitcher, 3 Stew. & P. 135; Drew v. The Chesapeake, 2 Doug. (Mich.) 33; Steamboat Co. v. Whilldin, 4 Har (Del.) 228; Moore v. Moss, 14 Ill. 106. This rule is as well settled and as generally observed as the rule of the road: "Keep to the right." Boats navigating the Mississippi river have the right to presume that it will be observed, and to act on that presumption.

The testimony in this case establishes conclusively that at the place where the collision happened, the river was nearly a mile wide, and that the boats collided within about one hundred and fifty yards of the east bank of the river. It is incontestibly shown that the Richmond was in the proper place for an ascending boat. She was near the east bank, under Twelve Mile point. The Sabine being the descending boat should, according to the common law of the river, have been out towards the middle of the stream, following the main current, and should have passed the Richmond one-third or half a mile to the right. Instead of this, it cannot be disputed, that when she was rounding Twelve Mile point, instead of taking the middle of the stream, she clung to the east bank of the river, just where she might expect to meet an ascending boat. To the disregard of this rule of the river by the Sabine, the collision must be attributed. If the Sabine had observed the rule, the collision would have been impossible. I have carefully examined the record, and I can find no excuse for the conduct of the Sabine. No reason is given and none existed why she could not keep the thread of the stream. The rule under consideration is not only one of great convenience and economy, but also of safety. It ought to be carefully observed. After the Sabine rounded Twelve Mile point, and the two steamers came in sight of each other, it is quite evident that each did all it could to avoid a collision; of this there can be no doubt. There is much testimony in the record about the signals given by the two boats after they came in sight of each other, and some conflict of evidence; also about the management of the boats, how they were headed, whether their engines were stopped or not, whether they had head way or stern way at the time of the collision. There cannot be the slightest doubt that whatever seemed likely to avoid a collision was done. It was a moment of excitement and alarm. The officers of the boats could not be expected to act with coolness and unerring discretion. In the hurry and terror of the imminent collision, they ought not to be held to any strict rule. They did their best to avoid a collision, after it became imminent, and failed. The fault lay further back. It lay, in my judgment, with the Sabine in not observing the salutary rule of the river: The ascending boat shall run the points and the descending boat the bends.

On this issue, therefore, I find for the Richmond. Accordingly there must be a decree dismissing the libel of the owners of the Sabine against the Richmond, and in favor of the owners of the Richmond against the Sabine for such damages as the Richmond suffered from the collision.

In the case of the Merchants' Mutual Insurance Company against the Richmond and the Sabine, the libel must be dismissed as to the Richmond, and a decree against the Sabine for such damages as the insurance company suffered from the collision.