GRING v. BOYER.

(Circuit Court of Appeals, Third Circuit. November 18, 1907.)

No. 28.

COLLISION—STEAM VESSELS MEETING.

Libelant's tug Patton, coming up the Delaware river at night with a tow on her starboard side, came into collision with the tug Cahill, passing down with a similar tow. The master of the Patton testified that shortly before the collision he saw the white towing lights of a vessel a half

mile ahead of him, but seeing no side lights he was unable to tell which way it was going. He gave a signal of one whistle and ported his helm, and receiving no answer he signaled again and again, ported and still received no answer, and shortly afterwards the Patton was struck on the port bow by the tow of the Cahill. *Held*, on the evidence, that the lights seen by the Patton were not those of the Cahill, but of another tug going up the river with a car float which passed on the starboard side of the Cahill and was between her and the Patton until the latter ported; that the Patton was in fault and responsible for the collision in violating rule 3 of the Inland Navigation Rules, Act June 7, 1897, c. 4, 30 Stat. 100 [U. S. Comp. St. 1901, p. 2882], which requires a vessel when approaching another whose course she fails to understand to signify such fact by several blasts, or rule 8, which prohibits an overtaking vessel from passing without the consent of the vessel overtaken.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 10, Collision, §§ 33–42.

Signals of meeting vessels, see note to The New York, 30 C. C. A. 630.]

Appeal from the District Court of the United States for the Eastern District of Pennsylvania.

For opinion below see 130 Fed. 989.

Henry R. Edmunds, for appellant.
Alfred Driver and Curtis Tilton, for appellee.

Before DALLAS and GRAY, Circuit Judges, and CROSS, District Judge.

CROSS, District Judge. The libel in this case was filed by Lewis Boyer, managing owner of the tug "John B. Patton," against Charles Gring, owner of the tug "Winfield S. Cahill," and managing owner of the barge "Berks," to recover damages to the tug "Patton," growing out of a collision between said vessels which occurred on the Delaware river, nearly opposite Coopers Point, November 28, 1900, at about 6 o'clock in the evening. Shortly prior to the accident, the tug "Patton," with the barge "Empire City" in tow, had started from Point Breeze and was proceeding up the Delaware river bound for the Gas House Wharf at Tioga street, while the tug "Cahill," with the barge "Berks" made fast to her starboard side, had left Pier 16, Port Richmond, Philadelphia, and was coming down the river bound for Norfolk, Va., but intending to stop at the Reed Street Wharf, Philadelphia, for another barge to be taken in tow. The "Patton" and her tow were, at the time, showing proper lights. There is some conflict in the testimony as to whether the barge "Berks" showed a green light on her starboard side, but we think the weight of the testimony shows that she did show such a light, and that as a matter of fact both tugs with their tows were properly lighted at the time of the collision. It was a starlight night, but dark. There was a light breeze blowing, and the tide was nearly flood. The testimony, as is not unusual in collision cases, is very conflicting, and it is almost impossible from the maze to ascertain the true state of facts. It should be borne in mind from the outset, however, that the burden of proof rests upon the libelant to show that the "Cahill" and her tow were in some material respect at fault, whereby the collision was caused.

The captain of the "Patton" admits that he saw the white towing lights of what he swears was the "Cahill" ahead of and slightly on

his port bow when she was about half a mile distant; that he thereupon gave a signal of one blast of his whistle to denote that he was keeping to the right, while at the same time he ported his helm about two points; that receiving no answer to his signal, he thereupon gave another blast of his whistle, and again ported his helm. He also admits that because he could not see the side lights of the boat in front of him, he was unable to tell definitely whether she was going up or coming down the river. There is, however, considerable testimony in the case tending to show, and which we think does show, that between the "Patton" and the "Cahill," just prior to the collision, there was a car float in the tow of a tug going up the river, and in order to reconcile the testimony of the captain of the "Patton" with the other testimony, we are compelled to conclude that the towing lights which he saw ahead, and which occasioned him to give the warning whistles above referred to, were the mast lights of the tug towing the car float, and not those of the "Cahill." Indeed, from the positions in which the tugs "Cahill" and "Patton" must have been at the time the first warning blast was blown, it would apparently have been impossible, owing to a bend in the river, to see the "Cahill" off the port bow of the "Patton" where the captain of the "Patton" says he first saw her. The captain of the "Cahill" testified positively to passing the car float on his starboard side, just before the collision, and the evidence reasonably satisfies us that it was the intervention of this car float which obscured the side lights of the "Cahill" from the lookout of the "Patton."

We deem it unnecessary, in this connection, to refer specifically to other evidence than that of the captain and mate of the "Cahill," both of whom were on watch at the time of the collision, and who testify that the "Patton" came out suddenly from behind the car float, and that when they saw her they immediately reversed their engine, and did everything in their power to prevent a collision. Their testimony in this respect is furthermore corroborated by an uncontradicted admission of the captain of the "Patton," made only a week or 10 days after the accident, and which is in direct conflict with the evidence given by him at the hearing. The admission was in response to the following salutation, addressed to the captain by the witness who testified to the interview: "I am glad to see you again. I heard you came near drowning." The captain answered: "Yes;" and added: "Well, it was an unavoidable case, as there was a car float came in between my boat and the 'Cahill,' or it would not have happened." The witness also testified that the captain said nothing about whistles or lights. It is true there is other evidence either directly conflicting or not readily reconcilable with the above, but the same might be said of any view of the case which could possibly be taken. Accepting then, as we do, the above as presenting the true situation of affairs, it is obvious that the "Cahill" was not in anywise at fault. The captain of the "Cahill" appears to have maintained a straight course throughout, and when the captain of the "Patton" ported his helm to pass to the starboard of the boat in front of him, he was attempting to pass to the starboard of the car float, and not of the "Cahill," and passing out, as he did from the stern of the car float diagonally across the

river, he suddenly and unexpectedly encountered and collided with the "Cahill" which was still maintaining her course. This theory would have caused the "Cahill" to strike the port bow of the "Patton" at about the angle at which it appears from the testimony she was struck.

This disposes of the case; but another view of the testimony might be taken which leads to the conclusion that the "Patton," whatever be said of the "Cahill," was at least measurably in fault. As already stated, her captain admitted that he did not know which way the boat on which he saw the white towing lights ahead of him was going when he twice sounded his whistle and ported his helm. In acting, therefore, as he did, he clearly violated rule 3 or rule 8, Act June 7, 1897, c. 4, 30 Stat. 100, 101 [U. S. Comp. St. 1901, p. 2882], which are as follows:

"When steam vessels are approaching each other, if either vessel fails to understand the course or intention of the other, from any cause, the vessel so in doubt shall immediately signify the same by giving several short and rapid blasts, not less than four, of the steam whistle."

"When steam vessels are running in the same direction, and the vessel which is astern shall desire to pass on the right or starboard hand of the vessel ahead, she shall give one short blast of the steam whistle, as a signal of such desire, and if the vessel ahead answers with one blast she shall put her helm to port; or if she shall desire to pass on the left or port side of the vessel ahead, she shall give two short blasts of the steam whistle as a signal of such desire, and if the vessel ahead answers with two blasts, shall put her helm to starboard; or if the vessel ahead does not think it safe for the vessel astern to attempt to pass at that point, she shall immediately signify the same by giving several short and rapid blasts of the steam whistle, not less than four, and under no circumstances shall the vessel astern attempt to pass the vessel ahead until such time as they have reached a point where it can be safely done, when said vessel ahead shall signify her willingness by blowing the proper signals."

The act of Congress in which the above rules appear provides that they, with other regulations therein found for preventing collisions, "shall be followed by all vessels navigating all harbors, rivers, and inland waters of the United States," with certain exceptions which need not be mentioned here, as they have no applicability to the present situation. Whether, therefore, the boat upon which the captain of the "Patton" saw the mast lights was going from or coming towards him, he clearly shows himself in fault. In either case he violated a prescribed rule of navigation, for he admits that he went ahead without receiving any answer to his signal in total ignorance of the direction the boat in front of him was taking.

Upon the whole case, then, we think the libelant has not shown satisfactorily, by the weight of the testimony, that the respondent's negligence caused the collision. It should be noted in this connection that the fact, if fact it be, that the "Cahill" was on the wrong side of the river, as found and relied upon by the learned judge below, was not set forth in the libel as one of the grounds of complaint.

The decree below should be reversed, with costs.