## THE DICTATOR.

### THE TRANSFER NO. 7.

(Circuit Court of Appeals, Second Circuit.   March 16, 1909.)

### No. 174.

COLLISION (§ 60*)—TUGS WITH TOWS MEETING—FAULT AS CAUSE OF COLLI-
SION.

A tug coming out from Newtown creek with a barge in tow on her
side, and starting up East river to the east of Blackwells Island, *held*
justified in taking the west side of the channel by the presence of other
tugs and tows on the Brooklyn side; and a collision between her tow
and a transfer tug passing down also with a tow *held* due solely to the
fault of the latter, which had no lookout and failed to observe or to
answer the signals of the up-bound tug until too late to avoid the collision,
the latter being as near as possible to the west side of the channel, and
having repeatedly signalled for passing starboard to starboard.

[Ed. Note.—For other cases, see Collision, Cent. Dig. §§ 73–77; Dec.
Dig. § 60.*]

Appeal from the District Court of the United States for the South-
ern District of New York.

The following is the opinion of the District Court by Adams, Dis-
trict Judge:

This action was brought by the owner of the barge Acme which was in tow
of the Dictator on the Dictator's starboard side, against that tug and also
against the New York, New Haven & Hartford Railroad tug Transfer No. 7
to recover for damages caused by collision with the tow of the lighter.   The
collision was with the tug itself but it appears here that No. 7, with a car-
float on her port side, was coming down the channel between Blackwells
Island and Brooklyn, and the Dictator with the Acme in tow had come out
from Newtown Creek, her tow being also on the port side, and was bound
up the same channel.   The collision, according to the great preponderance of
testimony, happened about opposite Third or Fourth Street on the Brooklyn
side and slightly to the eastward of the rocks which are a continuation of
Blackwells Island.   That excludes the Man-of-War rock because this collision
was a little above that.

Quite a large damage was done here, it is claimed to have been some $2,600
and the case has been very strenuously and ably conducted on both sides.   The
question for me to determine is whether one or both of these tugs is in fault.

I have followed the case quite closely.   I was somewhat confused in the be-
ginning and in fact confused to the end by the pleadings, No. 7 contending
that the Dictator was showing a light which indicated a crossing course, that
is, that she would go across the river; while the Dictator contends it was a
case of green to green after she had turned her course up the River.

My impression from all the testimony is that the Dictator's view of the mat-
ter should be sustained.   It seems to me that the Dictator, in passing or at-
tempting to pass, chose the left hand side—passing starboard to starboard—
and that has been very gravely criticised and perhaps with some force.   Of
course the law requires that vessels should pass the other way, that is, port
to port, and the Dictator initiated passing starboard to starboard contrary to
the dictates of the law.   The question is whether that is the cause of the colli-
sion or whether she was justified in adopting such a course. . She seeks to sus-
tain her proceeding by the fact that there were some tugs and tows operating
around the Long Island Railroad floats so that she says she was forced to the
western side of the channel.   And it has been shown that there were such tugs
operating at that point, and I think that she was forced to adopt a course on
the western side of that channel.

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

No. 7, in coming down, was in a position somewhat to the westward of the center of the channel. She was without a lookout. She did not see very well what was going on, confessedly the master in the pilot house could not see over the cars on his port side excepting at the forward end of them. He says, and I have no doubt it is true, that he could see over those cars some distance ahead anything that was not too close, but that anything close at hand would be obscured by the cars. But there was no lookout there to aid him. The lookout went on duty apparently just before the collision or if he was there, according to his own story, he did not see anything of the approach of the Dictator until shortly before the vessels came together. Therefore the master of the No. 7 was navigating in the dark, excepting as regards a boat at some distance ahead of him and excepting what might be on his starboard hand. I do not see why after the Dictator got turned around and on her course up river she should not have been seen, and I do not see why she was not justified in taking a course over to the left hand side of the channel.

There was another New York & New Haven Transfer No. 1, with two car-floats one on each side, coming down the river in advance of the No. 7. There was very little distance between them, it has been estimated I think about 250 feet between the tows, the No. 7 being somewhat further to the westward.

The first signal that was given by the Dictator was not answered by No. 7 but was answered by No. 1 and they agreed—if it can be considered as an agreement, because it is claimed by the Dictator that the signal was not designed for No. 1, that it was designed for No. 7. However that may be, it was an agreement for a starboard passage. No. 7 did not see the Dictator at that time and apparently did not hear her whistle. I do not know why, but the absence of a lookout is very significant as an explanation. The master of No. 7—who was only an extra man, and although he had a master's papers, had apparently had very little experience as a master—was in this case acting only as an extra man, one who is put on in case of emergency or deficiency of help and but for a short time. While I do not mean to say he was not generally competent yet I cannot avoid concluding that in view of what happened he was incompetent in some respects, either in attention or knowledge of what should be done, because when the Dictator blew and continued to blow signals of two whistles they should have been heard and observed by the master of No. 7. Although the state statute requires boats to navigate in the middle of the river, and that rule applies to the river up as far as Blackwells Island, in this case it could not apply as far as Blackwells Island because the rocks there prevented its being obeyed. The rocks extend down for some distance, a half a mile or more, from the end of the Island. The Dictator chose to navigate in the channel on the eastern side of the Island and there was no reason why she should not have gone there. Having concluded to take that course she turned up the river so that she was then showing her green light to Transfers No. 7 and No. 1 coming down the river and seeing their green lights. Under those circumstances she blew a signal of two whistles and worked over somewhat nearer the rocks so that at the time of the collision it is said she was only 50 or 60 feet away from them and the Acme, after she broke loose from the Dictator and before she was recovered by the tug actually did strike the rock. Therefore, it appears that the Dictator could not have gone any further than she did on that side. The only question is whether she had any right to go there at all.

I do not think that the state statute should prevail here because, although in terms it extends to Blackwells Island, these rocks were an extension of Blackwells Island and were such an extension as to force the Dictator to determine considerably before she got to Blackwells Island whether she would go one way or the other and when she got up to the rocks she was obliged to follow the channel she was in. With respect to the narrow channel rule of course she was violating that rule, she was on the wrong side of the channel. But, as I say, I believe she was justified in going there because of the peculiar condition which existed around the float bridges of the Long Island Railroad Ferry slips on the Brooklyn side. The tugs there were occupying those slips and maneuvering around there with floats and the Dictator, in going up the river, would have been very much embarrassed by the presence of those tugs and tows that were maneuvering there, and would also have been

embarrassed by the presence of No. 1 on the left hand side of the channel. I doubt very much if there was room for her to pass between No. 1 and No. 7. The channel is not very wide there, it has been stated that it is 500 or 600 feet but I think that is not enough, it is probably 800 or 1,000 feet at least; so that there was not really a great deal of room there after the Dictator got in that channel.

As regards the fault of this collision, No. 7 was undoubtedly in fault, according to her own admission. She had no lookout and her master could not see over her cars anything that was very near—although that may not have any bearing on this collision because he could see over them at a distance and if closer at hand he could see on the starboard side.

There has been some criticism made on the whistle of the No. 7 and that has been denied. I do not pay much attention to that. I think the whistle was probably all right. The difficulty was that the No. 7's whistle was not used until almost the last minute and then the signal was one blast, which was manifestly impossible to be obeyed at that time.

The Dictator was navigating according to her view in the best way to avoid these various vessels which occupied the other side of the channel and, while she was technically violating the narrow channel rule I do not think that violation was the cause of this collision. I think it was altogether brought about by the neglect of No. 7 to see what the Dictator was trying to do and to pay attention to conform her navigation to what was obviously a safe way of passing in view of all the circumstances.

I therefore allow a decree against the No. 7 and dismiss the libel as to the Dictator.

James T. Kilbreth, for appellant.
Alexander & Ash, for the Dictator.

Before LACOMBE, COXE, and WARD, Circuit Judges.

PER CURIAM. Decree affirmed, with costs.