## THE JOHN D. ROCKEFELLER. THE FALLS CITY. STANDARD OIL CO. v. DAVIES.

(Circuit Court of Appeals, Fourth Circuit. February 14, 1921.)

No. 1804.

1. **Collision ☞6—Pilot rules held not inconsistent with statutory rules, and hence binding.**

    Pilot rules, made under Rev. St. § 4412 (Comp. St. § 8166), for the Mississippi river, *held* not inconsistent with the statutory rules for the avoidance of collisions, and hence binding upon navigators.

2. **Collision ☞9—River customs subordinate to statutory rules, but violation is a fault, when not inconsistent with statutory rules.**

    The customs of the Mississippi river are subordinate to the statutory rules of navigation and the pilot rules adopted under Rev. St. § 4412 (Comp. St. § 8166), but, when not inconsistent with those rules, should be observed, and the violation of an established custom is attributed to a vessel as a fault.

3. **Collision ☞1—Right to expect observance of rules and customs by other navigators.**

    Navigators have a right to expect the observance by each other of the rules of navigation and the customs of the river.

4. **Collision ☞20—Vessel, seeing another's disregard of required precautions, must act in view of such remissness.**

    When a vessel sees, or should see, that another is disregarding required precautions against collision, and fails to take reasonable precaution herself, in view of the other's remissness, both will be held at fault.

5. **Collision ☞76—Navigator, seeing that signals are misunderstood, should stop and reverse.**

    Where it is evident to a navigator of a vessel that his signals are misunderstood, he should immediately stop and reverse, until his signals are understood, and he will be at fault for failure to do so.

6. **Collision ☞98—Steamer descending Mississippi river not entitled to give signal for starboard passing.**

    Under the statutory rules for navigation on the Mississippi river and the pilot rules made under Rev. St. § 4412 (Comp. St. § 8166), if an ascending steamer gave the signal for a port to port passing, or gave no signal, a descending steamer was bound to make a port to port passage, or sound the alarm signal and stop, and if necessary to reverse, and had no right to signal for a starboard to starboard passing, even though the ascending steamer was on the wrong side of the river, under a custom of the river.

7. **Collision ☞91—Fault of descending steamer in going forward, after giving signal for starboard passing, not assented to, held proximate cause of collision.**

    The act of a steamer, descending the Mississippi river, in signaling for a starboard to starboard passing, with knowledge that an ascending vessel must change her course and immediately increase her speed, and that the maneuver would be difficult, if not impossible, and in proceeding with the current without any assent to the signal, *held* a proximate cause of a collision.

8. **Collision ☞91—Ascending steamer held at fault in not repeating signal and taking precautions to prevent collision.**

    A steamer ascending the Mississippi river *held* at fault in failing to repeat its signal for a port to port passing, when not assented to, and in making no effort to avoid a collision, though it should have known that a descending steamer, rounding a bend in the sweep of the current, would

---

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

expect any ascending vessel to be on the other side of the river, under a custom of the river.

**9. Collision ☞91—Fault of ascending steamer, which was practically at rest, held not proximate cause of collision.**

Where a steamer, ascending the Mississippi river and changing pilots, was almost at rest, and a descending steamer could plainly see her, and was required by the rules of navigation to pass port to port, and had abundant room for so passing, the failure of the ascending steamer to signal for a port to port passing, or repeat her signal when not assented to, was not a proximate cause of the collision.

**10. Collision ☞95 (2)—Towing company and tugs, and not steamer, held responsible for navigation of steamer.**

Where a steamer was in charge of a towing company under an inde- · pendent contract of towing, the towing company and its tugs, and not the steamer, were responsible for a fault in her navigation.

Cross-Appeals from the District Court of the United States for the Eastern District of Virginia, at Norfolk; Edmund Waddill, Jr., Judge.

Libel by the Standard Oil Company, owner of the steamship John D. Rockefeller, against the steamship Falls City, with cross-libel by D. Davies, as master and claimant of the steamship Falls City, against the steamship John D. Rockefeller. From a decree dismissing the libel and cross-libel (260 Fed. 982), both vessels appeal. Affirmed.

Certiorari denied 255 U. S. ——, 41 Sup. Ct. 535, 65 L. Ed. ——.

John M. Woolsey, of New York City, and Edward R. Baird, Jr., of Norfolk, Va. (J. Parker Kirlin and Robert S. Erskine, both of New York City, on the brief), for appellant and cross-appellee.

Leon T. Seawell, of Norfolk, Va. (Hughes, Little & Seawell, of Norfolk, Va., on the brief), for appellee and cross-appellant.

Before KNAPP and WOODS, Circuit Judges, and SMITH, District Judge.

WOODS, Circuit Judge. At 5:30 p. m., November 15, 1917, two large ocean steamships, the John D. Rockefeller and the Falls City, collided on the Mississippi river near Pauline Street wharf, New Orleans. Both vessels were injured, and the Falls City, on arrival at Norfolk, was libeled by the Rockefeller for damages, placed at $40,-000. By cross-libel the Falls City claimed $30,000 damages.

The District Court, on testimony taken by commission, found the collision was due entirely to the fault in the navigation of the Falls City on the part of the Bisso Towboat Company, having the vessel in tow as an independent contractor, and held that company alone liable. As neither the Towboat Company nor its tugs were before the court, the result was a decree dismissing the libel and cross-libel. Both vessels appealed. The Rockfeller alleges that the Falls City did not have such an independent contract with the Bisso Towboat Company as to relieve her of the liability from fault in her navigation; the Falls City alleges fault in the navigation of the Rockefeller resulting in the collision.

The cause turns on the action of the navigators of the two vessels, in view of their legal rights and duties in the relative positions which

the evidence shows the vessels occupied to each other. At the point of collision the Mississippi river is about 2,000 feet wide. The Rockefeller was an oil tank steam vessel 458.3 feet long, 60 feet wide, and 28.6 feet deep, on her way up the river to Baton Rouge. At the time of the collision she had just exchanged a bar pilot for a river pilot. She was on the New Orleans side of the river, at a distance of about 75 to 150 feet from the shore, according to the varying estimates of her officers, and from 200 to 600 feet according to the varying estimates of the officers of the Falls City. The Falls City, a British steamer, 397 feet long and 52 feet beam, was descending the river, and came in sight of the Rockefeller on turning a bend about a mile distant.

It thus appears that the navigator of each vessel had opportunity to observe the movements of the other in abundant time to navigate his vessel so as to avoid any risk of collision. The witnesses are so at variance in their estimates of distances that it is impossible to state with accuracy the relative positions of the two vessels when they came in sight of each other. According to the testimony of the witnesses on the Falls City, she was in a course end on, or nearly end on, with the Rockefeller. The witnesses on the Rockefeller testify that, if the Falls City had kept her course, she would have passed the Rockefeller port to port about 400 feet distant. It is sufficient to say that the testimony leaves no possibility of doubt that the vessels were approaching each other so near end on as to involve a degree of risk of collision without careful navigation and full understanding and agreement as to signals and passing courses. The danger was more obvious from the fact that the Falls City had just rounded a bend, so that her exact course was difficult to discern from the Rockefeller. Harrison, the master of the Rockefeller, testified that when he saw the Falls City she was "a little" on the port bow of the Rockefeller.

What the vessels did after the emergency arose requires no attention, for we think it clear that the collision was due to disregard of the rules of navigation when the vessels first came in sight of each other. The applicable statutory rules governing navigation in the Mississippi river are:

"Rule 18. If two vessels under steam are meeting end on, or nearly end on, so as to involve risk of collision, the helms of both shall be put to port, so that each may pass on the port side of the other."

"Rule 21. Every steam vessel, when approaching another vessel, so as to involve risk of collision, shall slacken her speed, or, if necessary, stop and reverse; and every steam vessel shall, when in a fog, go at a moderate speed."

"Rule 24. In construing and obeying these rules, due regard must be had to all the dangers of navigation, and to any special circumstances which may exist in any particular case rendering a departure from them necessary in order to avoid immediate danger."

"Rule 26. Nothing in these rules shall exonerate any ship, or the owner, or master, or crew thereof, from the consequences of any neglect to carry lights or signals, or of any neglect to keep a proper lookout, or of the neglect of any precaution which may be required by the ordinary practice of seamen or by the special circumstances of the case."

[1] Pilot rules, made under section 4412 of the Revised Statutes (Comp. St. § 8166), provide as follows:

"Rule 1. When steamers are approaching each other from opposite directions, the signal for passing shall be one short and distinct blast of the whistle to alter course to starboard so as to pass on the port side of the other, and two short and distinct blasts of the whistle to alter course to port so as to pass on the starboard side of the other.

"When two vessels are meeting end on, or nearly end on, so as to involve risk of collision, the helms of both shall be put to port, so that each may pass on the port side of the other.

"When an ascending steamer is approaching a descending steamer, the pilot of the ascending steamer shall give the first signal for passing, which shall be promptly answered by the same signal by the pilot of the descending steamer, if safe to do so, and both shall be governed accordingly; but if the pilot of the descending steamer deem it dangerous to take the side indicated by the ascending steamer, he shall immediately signify the fact by sounding the alarm or danger signal of four or more short and rapid blasts of the whistle, and it shall be the duty of the pilot of the ascending steamer to answer by a signal of four or more short and rapid blasts of the whistle, and the engines of both steamers shall be immediately stopped, and backed if necessary, until the signals for passing are given and answered. After sounding the alarm signal by both steamers, the pilot of the descending steamer shall indicate by his whistle the side on which he desires to pass, and the pilot of the ascending steamer shall govern himself accordingly, the descending steamer being entitled to the right of way.

"Where possible the signals for passing must be made, answered and understood before the steamers have arrived at a distance of half a mile of each other."

These pilot rules are in no way inconsistent with the statutory rules, but are merely more detailed regulations for the avoidance of collisions, and are binding upon navigators. Belden v. Chase, 150 U. S. 674, 14 Sup. Ct. 264, 37 L. Ed. 1218.

[2] The customs of the river are, of course, subordinate to the statutory rules and to the pilot rules; but, when not inconsistent with those rules, they should be observed for promoting both dispatch and safety, and the violation of an established custom of this sort is attributed to a vessel as a fault. On the Mississippi river the recognized applicable customs, established, we think, by the weight of the evidence in this case, and recognized in all the cases we have been able to find on the subject, are these: Where the navigation is not materially affected by bends or other special conditions, the descending vessel should keep in the middle of the stream, and the ascending vessel should keep to her right side of the river. But, where there are bends, the ascending vessel has a right to run the points, and the descending vessel to run the bends; that is, the ascending vessel should take the course from the point on one side of the river to the nearest point on the other, to avoid the resistance of the current by keeping in the eddy water near the bank, while the descending vessel should keep the main channel current, following the bends, thus using the force of the current. Snow v. Hill, 20 How. 543, 53 L. Ed. 1017; Goslee v. Shute, 18 How. 463, 15 L. Ed. 462; The Magenta, 16 Fed. Cas. 391, No. 8,946; Bates v. The Natchez, 2 Fed. Cas. 1023, No. 1,102; Shirley v. The Richmond, 21 Fed. Cas. 1325, No. 12,795; Sinnott v. The Dres-

den, 22 Fed. Cas. 228, No. 12,908; The Magnolia, 16 Fed. Cas. 478, No. 8,958.

[3] As all vessels navigating the Mississippi river should observe these rules and customs, navigators have a right to expect their observance by each other.

[4] A rule of caution laid down by the courts—to be applied, however, with great discrimination—is that, when one vessel sees, or should see, that another is disregarding the required precautions against collision, and fails to take reasonable precaution herself, in view of the remissness of the other vessel, both will be held at fault. The Albert Dumois, 177 U. S. 250, 20 Sup. Ct. 593, 44 L. Ed. 751; Maria Martin, 12 Wall. 31, 20 L. Ed. 251; The America, 92 U. S. 432, 23 L. Ed. 724; The Manitoba, 122 U. S. 97, 7 Sup. Ct. 1158, 30 L. Ed. 1095; The New York, 175 U. S. 187, 20 Sup. Ct. 67, 44 L. Ed. 126; The Pegasus (C. C.) 19 Fed. 46; The Warren (D. C.) 18 Fed. 559; The Einar v. The Ivanhoe (D. C.) 45 Fed. 497.

[5] Where it is evident to a navigator of a vessel that his signals are misunderstood, he should immediately stop and reverse until his signals are understood, and he will be held at fault for failure to do so. The Johnson, 9 Wall. 146, 19 L. Ed. 610; The Imperator (D. C.) 76 Fed. 879; Brooklyn Ferry Co. v. U. S. (D. C.) 122 Fed. 696; The Peconic (D. C.) 124 Fed. 848; The Eugene F. Moran, 154 Fed. 41, 83 C. C. A. 153; The Dictator, 169 Fed. 789, 95 C. C. A. 255; The Tug Boat No. 6, 170 Fed. 306, 95 C. C. A. 502.

[6] Under the pilot rule above quoted the Rockefeller, as the ascending steamer, had the right and duty to give the first signal for passing, and the navigator of the Falls City was bound to yield by answering with the same signal. If, therefore, the Rockefeller gave the signal of one blast, requiring a port to port passing, the navigator of the Falls City was bound to give a like response, unless he regarded the port to port passing dangerous; and in that event he was not allowed to give a two blast signal, requiring starboard to starboard passing, but his only right was to sound immediately the alarm signal, immediately stop, and, if necessary, reverse his engine. Even if it be assumed that the Rockefeller was on the wrong side of the river under the custom of navigation, that did not exempt the navigators of the Falls City from their obligation to assent to the one-blast signal of the Rockefeller, the ascending steamer, as required by the pilot rules, or even in the absence of a signal to navigate to starboard, so as to make a port to port passage as required by both the statutory and pilot rules.

[7] According to the testimony of the officers of the Falls City and the officers of the tugs, they observed the Rockefeller from one-half mile to a mile distant, 200 to 500 feet from the New Orleans shore. It was therefore evident to her navigator that the Rockefeller was coming up on the New Orleans side of the river, and it should have been evident to him that the Rockefeller was moving very slowly, engaged in exchanging pilots. In this situation her witnesses testify her navigator signaled for a starboard to starboard passing. He was charged with knowledge that the Rockefeller would have to change her course and immediately increase her speed in order to pass starboard

to starboard, and with knowledge that this maneuver would be difficult, if not impossible. Charged with this knowledge, and with the further knowledge that under the pilot rule the Rockefeller was entitled to give the commanding signal, he was bound, at the very least, as soon as he failed to receive an assent to his signal for a starboard passage, either to navigate to starboard, so as to pass port to port, in obedience to the rules, or to reverse and stop. Instead of doing this, according to the testimony on his own behalf, he proceeded without change until he had given a second signal for a starboard passing, and received a dissent from the Rockefeller of one blast, demanding a port to port passing. It was then too late. Going forward with the current, which made control of his ship more difficult, when there was no assent to his signal, on the assumption that the Rockefeller would yield to his demand, and that he could have a safe starboard to starboard passing, was evidently a proximate cause of the collision.

[8] The case of the Rockefeller is more difficult. The navigator of the Rockefeller should have known that the Falls City, rounding the bend in the sweep of the current, would probably expect any ascending vessel to be on the other side of the river running the points, according to the custom, and this situation required extra precaution on his part. Gring v. Boyer, 157 Fed. 220, 84 C. C. A. 668. Her navigator was indifferent to the signals of the Falls City, took no account of the failure of the Falls City to assent to his signal, did not promptly repeat it, and made no effort to avoid the collision until the Falls City was too near to prevent it. This is shown by the testimony of the officers of the Rockefeller themselves, which is inconsistent and unsatisfactory. Harrison, the master, testified that when the Falls City was a half mile away the bar pilot on the Rockefeller gave a signal of one blast for a port to port passing and received an assenting signal of one blast; that the courses of the two vessels at that time were parallel, about 400 feet apart; that immediately after giving the assenting signal the Falls City suddenly changed her course and swung across the course of the Rockefeller. The master also testified that another signal of one blast was given by the river pilot of the Rockefeller, five minutes after the first. He is contradicted, however, by the other officers on the Rockefeller. Davies, chief engineer, and Seagren, third officer, testified that they heard the single blast from the Rockefeller, but heard no signal of any kind from the Falls City. Lombard, the bar pilot, says he gave the signal of one blast, but could not remember response or signal of any kind from the Falls City. Lombard gives also the significant testimony that, when the Falls City was half a mile distant, he blew one blast, without any impression of an assenting signal. He appears, according to his testimony, to have leisurely turned over the Rockefeller to the river pilot, without taking further notice of the Falls City or giving any other signal, although the Falls City was coming toward the Rockefeller, having given no response to indicate that the signal had been heard or understood. According to the testimony of Neihysel, the river pilot of the Rockefeller, the Falls City was only 150 to 200 yards away when he gave the second signal of one blast. Lombard testified, also, that

after going to the shore in a motorboat he walked two squares and was about to step on a street car before he heard any danger signal.

Much consideration of the evidence leads to these conclusions: The Rockefeller and the Falls City were approaching each other, if not end on, near enough to that relation to require that each should give careful attention to the rules of navigation to prevent collision. The Falls City signaled for a starboard to starboard passing, and without an assent from the Rockefeller proceeded until it was too late to avert a collision. The Rockefeller gave a port to port signal, and paid no attention to the signal of the Falls City, when, if she had observed, she would have known that her signals had not been understood, and that the Falls City and the two tugs were coming on, demanding a starboard to starboard passing. She did not promptly repeat her signal when it was not answered.

[9] The navigators of the Rockefeller are subject to criticism for their failure to repeat the signal, and for not attending more closely to the signals and movements of the Falls City. She would be held at fault, and liable, if her negligence in these respects had been the proximate cause of the collision. But we do not think it was. She was almost at rest; the Falls City could plainly see her, and was enjoined by the rules to pass port to port. There was abundant room for the passing, without any movement of the Rockefeller. Under such conditions it was the obvious duty of the Falls City to pass port to port, even if the Rockefeller had given no signal. Nothing could have justified the attempt of a starboard to starboard passing, except a consenting signal from the Rockefeller. Her navigators are therefore not in a position to charge the accident to fault of the Rockefeller in not signaling to her to do what the law required her to do. We think the fault in the navigation of the Falls City was the sole proximate cause of the accident.

[10] The Falls City being in charge of the Bisso Towboat Company under an independent contract of towing, that company and its tugs, and not the Falls City, are responsible for the fault in her navigation. Sturgis v. Boyer, 24 How. 110, 16 L. Ed. 591; Eugene F. Moran, 212 U. S. 466, 29 Sup. Ct. 339, 53 L. Ed. 600; The Cromwell, 259 Fed. 166, 170 C. C. A. 234; The Dorset, 260 Fed. 32, 171 C. C. A. 68.

Affirmed.